[S. F. No. 13894.  In Bank.—May 1, 1931.]

GEORGE W. LEY, Petitioner, v. ROBERT DOMINGUEZ, City Clerk, etc., Respondent.

Arthur A. Weber for Petitioner.

Erwin P. Werner, City Attorney, and William H. Neal and Frederick von Schrader, Assistant City Attorneys, for Respondent.

Overton, Lyman & Plumb and Fredericks, Hanna & Morton, *Amici Curiae.*

THE COURT.—Petitioner request a writ of mandate directing the city clerk of the city of Los Angeles to examine certain referendum petitions according to law, in order to determine whether the same are signed by the requisite number of qualified electors, and to certify the results of his examination to the city council. By stipulation it was agreed

that, subject to the terms of the stipulation, the findings of fact in certain action entitled *Woodward* v. *Dominguez* should be deemed to be the facts in this proceeding and determinative of all issues of fact herein presented. As disclosed from these findings, and from the admitted allegations in the pleadings, the following are the facts out of which this controversy arose:

The city council of Los Angeles duly passed two ordinances, by the terms of which certain real property, which had theretofore been restricted to a residential use, was included within the zones permitting a qualified business use thereof. The two ordinances were duly published, as required by the terms of the city charter, on February 13, 1930. On March 15, 1930, certain documents, purporting to be referendum petitions, were delivered to respondent clerk. These petitions purported to require the city council to submit the question of the adoption or rejection of the two ordinances to a vote of the people. They will hereafter be referred to as petition A and petition B.

Petitioner is a registered qualified elector and a taxpayer of the city of Los Angeles and is one of the signers of the two petitions. It appears that on petition A there were 45,087 names and that on petition B there were 44,426 names; that the number of signatures of registered qualified electors required on each of said petitions in order to make them effective was 25,843; that respondent city clerk has determined, upon an examination of the registration records, that on petition A there are only 24,076 signatures of registered qualified electors who have registered since January 1, 1930, and that on petition B there are only 23,526 such signatures. Respondent clerk refused to certify the balance of the signatures on certain specified and admitted grounds, the validity of such refusal being the question presented on this petition.

The signatures which the city clerk refused to certify, for convenience, can be divided into several groups:

A. It was found that on petition A there are 761 signatures and on petition B 902 signatures with the wrong precinct number set opposite each signature. The precinct number in each case was not inserted by the signer of the petition, but by its sponsors, the work being rendered especially difficult because, just prior to January 1, 1930, the election precinct lines within the city were re-established

and renumbered. The maps and records showing the lines of the new precincts were on file and open to the public after January 1, 1930. The city clerk, by an examination of the registration records and the precinct maps above mentioned, determined the proper precinct number of some of the signers in this group, and could have determined the proper precinct number of the balance, but has refused so to do, and, unless ordered to do so by this court, will refuse to approve any of such signatures. The sponsors of the petitions, subsequent to filing them, and while they were being checked, offered to supply the city clerk with the proper precinct numbers, but the city clerk refused to use the offered information.

B. On petition A there are 1419 signatures and on petition B 1344 signatures with no precinct number opposite such signatures. Just as in the case of group A, *supra*, the sponsors of the petitions, subsequent to filing them, and while they were being checked, offered to supply the city clerk with the proper precinct numbers, but the city clerk refused to use the offered information.

C. On petition A there are 595 signatures and on petition B 560 signatures of persons who signed what appear to be and what respondent clerk assumes are their husbands' initials or given names, using the prefix ''Mrs.'' in each instance. As to each of these signatures the respondent found affidavits of registration executed subsequent to January 1, 1930, by a person with the same surname as shown on the petitions, and from the same address. In each case there was a woman registered from the same address and a man with the same initials or given name as used by the married woman in signing the petitions, but inasmuch as the registration affidavits contained the given name of the woman, the respondent clerk refused to certify these names.

D. On petition A there are 14,153 signatures and on petition B 14,048 signatures of persons who have not registered in the period of January 1, 1930, to March 15, 1930. Respondent clerk has refused to examine the records of registration for the period 1928–1929, on the ground that the only persons qualified to sign said petitions are those registered since January 1, 1930, and before March 15, 1930. There is an undetermined number of those whose signatures were disallowed for this reason who had registered for the preceding two-year period.

E. On sheets embraced within petition A there are 1399 signatures and on sheets embraced within petition B there are 1370 signatures, which sheets bore no affidavit of verification except the affidavit of verification of a person who had not registered in the period January 1, 1930–March 15, 1930. In other words, these signatures were obtained by a circulator who had not registered in that period.

F. In addition to those signatures set forth in group E, *supra,* the city clerk refused to certify the signatures of certain persons, although such signers were qualified registered electors, because the circulators who secured these signatures were, in the opinion of the respondent, disqualified. Although not including all of the signatures thus disallowed, the following groupings illustrate the grounds of these alleged disqualifications:

1. 720 signers of petition A and 660 signers of petition B were disqualified, although admittedly registered qualified electors, because the respondent clerk discovered on evidence outside the registration records that the circulators who secured said signatures moved to a certain address less than thirty days before securing signatures on the petitions.

2. 94 signers of petition A and 95 signers of petition B were disqualified, although admittedly registered qualified electors, because respondent clerk discovered on evidence outside the registration records that, although persons with the same name and address were registered as circulated and verified the petitions, no one giving the name of such circulator ever resided at the address from which he appears to have registered.

3. One circulator, respondent clerk discovered on evidence outside the registration records, who had secured 71 names of registered qualified electors on each petition, had moved from the address given in the affidavit of registration before certifying the petitions.

4. Respondent clerk refused to certify as valid 99 signatures of registered qualified electors on each petition, because it appears, on evidence outside the registration records, that the circulators who secured these signatures moved from the address given in the affidavit of registration before March 15, 1930, the evidence not showing that the names so secured were not secured before the time of moving.

Petitioner admits that the respondent clerk properly refused to certify the names of any signer who registered after

March 15, 1930 (401 on petition A and 374 on petition B), provided said persons had not registered in the preceding two-year period. It is also conceded that 97 signatures on petition A and 170 on petition B were properly disallowed because they are undecipherable, and 746 on petition A and 757 on petition B should be disallowed because they do not compare. Petitioner also concedes that certain circulators, not included in group F, *supra,* were disqualified and that all signatures secured by them should be disallowed. In respect to all other signatures set forth in groups A to F, *supra,* petitioner contends that respondent clerk has acted arbitrarily and in excess of his powers in refusing either to certify all of said names as valid or to determine the qualifications of said signers on information or from records which the city clerk has refused to use.

Before discussing the validity of the action of the city clerk in refusing to certify the names above set out, certain principles of construction applicable to charter and statutory provisions providing for referendum by popular vote should be mentioned. Some states have held that such provisions should be strictly construed, on the theory that the right of referendum is a grant to a small minority of the people and a limitation on the rights of the majority. (*Ohio Valley* v. *Hagerty,* 14 Ohio App. 398; *Ferle* v. *Parsons,* 210 Mich. 150 [177 N. W. 397].) In those jurisdictions that follow this rule the liberal construction indulged in in interpreting election statutes generally, in order to safeguard the rights of the people, is not extended to referendum statutes. That is not the rule in this state. ■ It is well settled that the power of initiative and referendum, as exercised in this state, is the exercise by the people of a power *reserved* to them, and not the exercise of a right *granted* to them. Section 1, article IV, of the Constitution expressly so provides. (See, also, *McClure* v. *Nye,* 22 Cal. App. 248 [133 Pac. 1145]; *Dwyer* v. *Berkeley,* 200 Cal. 505 [253 Pac. 932].) For that reason, and in order to protect the people of this state in the exercise of this reserved legislative power, statutory or charter provision dealing with the referendum should be afforded the same liberal construction afforded election statutes generally.

■ At the outset of the discussion dealing with the merits of this controversy we are met with the contention made by *amicus curiae,* and concurred in by respondent,

that the petitions filed herein were filed too late. This contention is based on the following facts: The ordinances to which the petitions in question are directed were published on February 13, 1930. The petitions were filed March 15, 1930. It is contended that the last day upon which petitions could be filed was March 14, 1930. Section 281 of the city charter of Los Angeles provides that no ordinance shall go into effect "until the expiration of thirty days from its publication", except certain specified ordinances, which excepted ordinances "shall take effect upon their publication". Section 282 of the charter is the provision particularly dealing with referendum petitions. It provides in part that "at any time within the thirty days mentioned in the preceding section" a referendum petition may be filed, which shall operate to suspend the ordinance until the city clerk checks the petitions. It is contended that under these provisions the thirty-day period therein provided for starts to run from the date of the publication, that is, the date of publication should be included in computing the thirty-day period. If this method of computation be employed, the last day for filing the petitions would have been March 14, 1930. Counsel seek to avoid the ordinary rule of computation of time, which excludes the first day and includes the last, as set forth in section 12 of the Code of Civil Procedure and section 12 of the Political Code, on the theory that the statutory rule has no application to a situation when the reckoning is to be made from an "act done". In such a case, it is contended, the day upon which the act is to be done must be counted as one day. (*Municipal Improvement Co.* v. *Thompson*, 201 Cal. 629, 631 [258 Pac. 955].) Assuming the existence of such an exception to the ordinary rule for computation of time, we do not believe the situation here presented comes within the exception. The express language of section 281 of the charter is that no ordinance shall go into effect "until" the expiration of thirty days from its publication. Properly interpreted, this would seem to mean thirty days *after* the publication, which necessarily excludes the day of publication.

We can see no reason for applying to the above charter provisions a method of reckoning different from and an exception to the ordinary method of computation. The gravest considerations of public order and security require that the method of computing time be definite and certain.

Before a given case will be deemed to come under an exception to the general rule the intention must be clearly expressed that a different method of computation was provided for. (*Scoville* v. *Anderson,* 131 Cal. 590 [63 Pac. 1013]; *Bank of Lemoore* v. *Fulgham,* 151 Cal. 234 [90 Pac. 936]; 24 Cal. Jur., p. 581, secs. 10 and 11.) The petitions were, therefore, filed in time.

█ *Amicus curiae* likewise contends, and respondent concurs, that the only person permitted to sign a referendum petition is a *qualified elector* who has registered, and that registration of itself does not prove that the signer is qualified. Section 338 of the charter provides that "only an elector who is a registered qualified elector shall be entitled to sign the same". To be a qualified elector, it is contended, the signer must have been registered at least thirty days. The argument is based on the fact that under section 1096 of the Political Code a person may register, even though at the time of registration he is not qualified, provided that he will be qualified at the time of the next election. It is argued that under the above charter provision the signer must be qualified at the *time of signing* the petition, and that inasmuch as it is impossible to tell from the affidavit of registration whether the person at the *time of registering* has been a resident of the precinct thirty days, only those persons who have been registered at least thirty days at the time of signing or at the time of filing the petitions should be considered registered qualified electors. The point is without merit. It is true that section 338 of the charter requires a signer of a referendum petition to be a "registered qualified elector", but the same section provides that the city clerk in examining the petitions is restricted in his examination to the records of registration, and must determine the qualifications of the signers from such records (except as hereinafter noted). Certainly it was never intended by these provisions that a registered qualified elector should be deprived of his right to sign a referendum petition simply because the city clerk may guess or believe that the signer at the time of registering may not have been a resident of the precinct for thirty days before he registered. The charter does not so provide. Adopting, as we must, a liberal rule of interpretation, so as to protect the citizen, if possible, in the exercise of his reserved right, we are of the opinion that the charter pro-

vision restricting signers of referendum petitions to registered qualified electors, when interpreted in connection with section 1096 of the Political Code, which allows those not qualified to register, provided they will be qualified at the time of the next election, means that any registered elector who will be qualified to vote at the next succeeding election may sign such a petition. ▮ The charter provision making the registration records the sole source of information (except in the one situation noted later in this opinion) to be consulted by the city clerk in passing on the petitions, clearly has indicated that the clerk cannot go beyond these records. If the person signing the petition has registered and has subscribed to the required affidavit, he may sign the petition, and the clerk has no power to disqualify him by reason of a conjecture on his part, or by reason of information gained from other than the registration records, that the signer was not qualified to vote at the time of registering, though he would be at the next election. Any other rule might result in depriving a major portion of the people of their right to sign such petitions, and this we are not inclined to sanction.

We turn now to a consideration of the various groups of signers, set forth *supra,* all of whom the clerk has refused to certify.

▮ A. Those whose signatures were followed by the wrong precinct numbers.

It appears from the admitted facts that certain signatures were disallowed by the city clerk solely because the names were followed by the incorrect precinct number. It further appears that the city clerk could have, and, in fact, in some cases did ascertain the correct precinct numbers of such signers by a reference to the records of registration and from the official precinct maps. Moreover, the city clerk refused to certify certain of the names in this group although on one petition the proper precinct number was found while on the other the incorrect precinct number was inserted. The latter names he refused to certify. It is also an admitted fact that during the period the city clerk was examining the petitions the sponsors of the petitions offered to supply the correct precinct numbers to the clerk, but he refused to accept this information.

Section 273 of the charter provides for the form and content of such petitions. Prior to 1927 there was no requirement that the petition must contain the precinct num-

bers of the signers. In that year section 273 was amended to provide that "the number of the election precinct of each signer shall also appear on the paper after his or her name".

Prior to the adoption of this admendment the duty of ascertaining the correct precinct number of signers of such petitions rested entirely on the city clerk. Under the amendment, quoted *supra,* it is not required that the signer of the petition must insert this information, the terms of the amendment permitting the precinct number to be inserted by anyone. It was obviously contemplated, under this amendment, that the burden should fall on the sponsors of the petitions, a task rendered particularly difficult in this case because of the complete re-arrangement and change in precinct lines that took place immediately before these petitions were circulated.

It is obvious that the addition of precinct numbers adds nothing to the petition as a petition of the people. The provision was designed simply as a mechanical aid to the city clerk in investigating, identifying and verifying the persons and signatures of the purported signers. (See *Osborn* v. *Board of Supervisors,* 27 Cal. App. 85 [148 Pac. 970].) It should not be held that failure on the part of the signers to add the precinct numbers opposite their names would invalidate the signatures of persons otherwise qualified.

B. What we have already said in regard to the insertion of incorrect precinct numbers likewise applies to the group identified under subdivision B, *supra,* where no precinct numbers were inserted. The principles govering both situations are identical.

C. Signatures by married women who signed what respondent clerk assumes are their husbands' given names or initials, with the prefix "Mrs." As to these signatures the respondent found affidavits of registration executed subsequent to January 1, 1930, by persons with the same surnames as shown on the petitions, and from the same addresses. In each case, in addition to a woman being registered from the address given on the registration affidavit, there was a man with the same given name or initials as was used by the woman in signing the petitions. In other words, the situation is one where a married woman, at the time of registering, signed her own given name, as

required by law, but, in signing the petitions, used the given name or initials of her husband. There is nothing in the charter provisions or in the general law that requires a married woman to sign a petition of this nature with the same given name as was used by her at the time of registration. The charter merely requires that the petition be signed by registered qualified electors, and is silent as to the form the signature must take. Thus, in *Conn* v. *City Council*, 17 Cal. App. 705 [121 Pac. 714], it was held that a person could sign a petition, using the initials of his given names, although, when he had registered, he had used his full given names.

In this regard the respondent clerk has the duty of examining the signature on the petition and comparing it with the signature found in the registration records. This can be done by an examination of the handwriting and the surnames. The question is simply one of identity. If reasonably satisfied by such examination that the two signatures are those of the same person, they should be approved, regardless of the given name or initials that are used.

■ D. Respondent has refused to refer to the registration records for the period 1928–1929, and has refused to certify as valid all signatures of persons who have not registered between January 1, 1930, and March 15, 1930. The question thus presented is whether a petition circulated in the first three months of an even-numbered year can be signed by an elector who has not registered since the first day of an even-numbered year, but had registered for the two-year period immediately preceding.

As stated above, all referendum petitions are required by section 338 of the charter to be signed by registered qualified electors. The question thus presented is what is a "registered qualified elector" within the meaning of section 338.

Section 1094 of the Political Code provides for the new and complete registration of voters every even-numbered year, with the exception that a person may vote at any election held between January 1st and April 1st of an even-numbered year, based on his old registration. The same section also provides that "all affidavits of registration made prior to the first day of January of any even-numbered year shall be deemed cancelled upon said day, except for the sole purpose of being used as hereinbefore stated

at elections held thereafter and before the first day of April of that year. . . ." Thus it is expressly provided by state statute, and no contradictory or inconsistent provision is found in the charter, that an elector may vote between January 1st and April 1st of an even-numbered year although he has not registered during that year. It therefore necessarily follows that during the first three months of each even-numbered year he is a "registered qualified elector" as far as his right to vote is concerned. There would seem to be no reason to hold that a different rule should apply to the right to sign a referendum petition calling for an election. It is true that section 1094, as quoted *supra,* provides that the old registration shall be canceled on January 1st of every even-numbered year, except for the "sole purpose" of qualifying the elector to vote at an election to be held between January 1st and April 1st of that year. But unless this section conferring the right to vote upon such registrants during this period be interpreted so as to include the right to sign initiative and referendum petitions, which right is of the same general nature as the right to vote, it is obvious that the referendary right conferred by article IV, section 1, of the Constitution and by the city charter will be unduly restricted and, in fact, almost entirely taken away during the first few months of each even-numbered year. If section 1094 of the Political Code does provide that only those who have registered since the first of an even-numbered year can sign referendum petitions in the first three months of that year, it is clearly unconstitutional, for it would result in the practical destruction of the right of referendum during that period. But we do not believe that it is necessary to hold the section unconstitutional. Liberally construed the section can and should be interpreted so as to preserve the referendary right during the first three months of each even-numbered year in the same manner that the elective franchise is protected.

Respondent clerk also relies upon the provisions of section 1083a of the Political Code. That section provides that "whenever by the Constitution or *laws* of this state" any referendum petition is required to be signed by "qualified electors", only an elector who is "a registered qualified elector at the time he signs such petition or paper shall be entitled to sign the same, and no elector shall be en-

titled to sign any such petition or paper on or after the first day of January of any even-numbered year", unless he shall have registered in that year. This section, by its very terms, applies only to state legislation and has no application in and of itself to municipalities. Not only in its opening clause does it refer to the "laws of this state", but the last part of the section refers to the duties of county clerks and registrars of voters in checking such petitions. No reference is made to city clerks, the officers whose duty it is to check municipal referendum petitions. As applied to state legislation, section 1083a is reasonable and understandable. The legislation meets in the early months of odd-numbered years, and adjourns in April or May. Referendum petitions must be circulated within ninety days of adjournment. Obviously, therefore, there is no unreasonable restriction on the referendary right, as applied to state legislation, if registration certificates are canceled on December 31st of odd-numbered years.

It is to be noted that section 338 of the charter, *supra,* although virtually copied from section 1083a of the Political Code, with the exception that it refers to the charter instead of to the state Constitution or laws, omits the clause in section 1083a in reference to the disqualification of registrants on December 31st of every odd-numbered year. The reason is obvious. A rule applicable to state legislation, where the legislature only meets in regular session in the first months of odd-numbered years, is not applicable to municipal legislation, where the legislative bodies are in continuous session. What would be a reasonably regulation in the former case would not be reasonable in the latter.

We are therefore of the opinion that, when section 338 of the charter is interpreted in connection with section 1094 of the Political Code, all those who registered for the period 1928–1929, as well as those who have registered since January 1, 1930, and before March 15, 1930, are "registered qualified electors" in the sense that registration in either period permits them to sign referendum petitions.

E. Respondent clerk has refused to allow certain signatures because they were secured by circulators whom the clerk held were disqualified, for the same reason that he refused to certify as valid the names of signers in group D, *supra.* What we have heretofore said in reference to

the qualifications of signers of the petitions likewise applies to the circulators of petitions. Assuming, but not deciding, that under sections 272, 273 and 338 of the charter, the circulators of such petitions must have the same qualifications as signers thereof, under the tests laid down in discussing group D, *supra,* the circulators herein involved possessed the necessary qualifications. If any circulator was registered during the 1928–1929 period, or after January 1, 1930, and before March 15, 1930, he is a properly qualified circulator, and all proper signatures secured by him should be certified as valid.

■ F. Respondent clerk refused to certify as valid the signatures of certain persons, on the ground that the circulators securing these signatures were disqualified on grounds other than those set forth in reference to group E, *supra.* It is found as a fact that all the signatures thus secured were signatures of registered qualified electors. The city clerk disqualified those circulators on the ground that the findings of fact in the case of *Woodward* v. *Dominguez* disclosed that, although all of the circulators were registered, in the case of some of them, no person of the name given on the affidavit to the petitions or on the registration records ever lived at the address given; or, in the case of others, such circulators moved either from the address given to parts unknown or to a different precinct, within thirty days of securing names. Nineteen circulators were thus disqualified. We do not deem it necessary to discuss these grounds of alleged disqualification in detail. What we have already said in regard to the qualifications of signers in discussing the contentions of *amicus curiae, supra,* disposes of some of the alleged grounds of disqualification, the balance of them not being pertinent to this inquiry. We are of the belief that in reference to passing upon the qualifications of circulators, the city clerk is restricted in his examination to a comparison of the signature found on the affidavit of verification attached to the petition with the signature found on the affidavit of registration. The affidavits of verification in each case are admittedly in proper form and raise a presumption in favor of the qualifications of the circulator. No power of investigation or examination, as is conferred on the city clerk by section 273 of the charter in reference to passing upon the validity of signers' signa-

tures, is conferred on the city clerk in reference to passing on the validity of the signatures of the circulators. We are of the opinion that in reference to the examination of the affidavits of the circulators, the city clerk is restricted in his examination to a comparison of the signatures contained on the affidavit and on the registration records. The city clerk, except in the one instance provided for in section 273 of the charter, is not clothed with authority to receive or consider extraneous evidence in determining the qualifications of signers or circulators. His duty is simply to determine whether the circulators are qualified electors, and, in determining this question, he is limited by the express provisions of section 338 of the charter to an examination of the registration records. If fraud has been committed, a court of equity and not the city clerk is the proper forum to determine the matter in the appropriate proceedings. (*Williams* v. *Gill,* 65 Cal. App. 129 [223 Pac. 559].)

We have discussed, at some length, the duties and powers of the city clerk in reference to his examination of referendum petitions. It must be remembered that his duties are purely ministerial and not judicial. Under the law, he should exercise his powers and perform his duties in such a manner as will, whenever possible, protect rather than defeat the right of the people to exercise their referendary powers.

Let a peremptory writ of mandate be issued, directing the respondent to examine the petitions, in accordance with the conclusions set forth in this opinion.

CURTIS, J., Concurring and Dissenting.—I concur in the views expressed in the foregoing opinion, except those set forth in paragraph C thereof, the effect of which is to hold that a referendum petition signed by a married woman by using the name of her husband with the prefix, "Mrs." instead of her own given name is valid and should be so certified by the city clerk. The statute requires that the affidavit of registration of a married woman must show her name at length, including Christian or given name, and middle name or initial, to be preceded by the designation of Mrs. Where the petition is signed by a married woman using her husband's given name with the designation of Mrs., the city clerk, so the majority opinion holds, must then ascertain whether there is registered at the same

address given by her in her affidavit of registration a man with the name given by her in signing the petition, and if so, he is then to determine whether the two are husband and wife, and if the evidence considered by him is sufficient for this purpose, he must then hold her signature to the petition as valid and count it in making up the total signatures on the petition. I do not believe that the legislature ever intended to cast the burden upon the city clerk to go beyond the affidavit of registration of the voter, and her signature on the petition to determine the identity of the person signing the petition. There is nothing which supports the majority opinion to be found in the case of *Conn* v. *City Council* cited therein. It simply holds that where a voter gives his full name in the affidavit of registration and signs the petition with his initials the signature to the petition is good. In that case the names used in the two instances were the same. It has frequently been held that a person may use his initials in signing a document and that such a signature is as valid as if the full name had been used. In the case before us the names are radically different and the city clerk is compelled to resort to evidence beyond that found in the documents before him to ascertain that the person using the two names is one and the same person.

Shenk, J., concurred.