[Civ. No. 22336. Fourth Dist., Div. One. June 18, 1980.]

COALITION FOR FAIR RENT, Plaintiff and Respondent, v.
CHARLES ABDELNOUR, as City Clerk, etc.,
Defendant and Respondent;
SAN DIEGO APARTMENT ASSOCIATION et al.,
Interveners and Appellants.

[Civ. No. 22252. Fourth Dist., Div. One. June 18, 1980.]

COALITION FOR FAIR RENT, Plaintiff and Respondent, v.
CHARLES ABDELNOUR, as City Clerk, etc.,
Defendant and Appellant.

[Civ. No. 22683. Fourth Dist., Div. One. June 18, 1980.]

COALITION FOR FAIR RENT, Petitioner, v.
CHARLES ABDELNOUR, as City Clerk, etc., Respondent.

COUNSEL

John W. Witt, City Attorney, Ronald L. Johnson, Chief Deputy City Attorney, and Eugene P. Gordon, Deputy City Attorney, for Defendant and Appellant, Defendant and Respondent and Respondent.

Luce, Forward, Hamilton & Scripps, Louis E. Goebel and Ruth R. Mijuskovic for Interveners and Appellants.

Gregory A. Veach, Victor Harris and Charles Wolfinger for Plaintiff and Respondent and Petitioner.

OPINION

**BROWN (Gerald), P. J.**—Coalition for Fair Rent has petitioned for a writ of mandate to order the clerk of the City of San Diego (City) to qualify the Fair Rent Initiative for placement on the ballot. Already pending here is (1) City's appeal from a superior court judgment which granted Coalition a writ of mandate, directing the clerk to count the signatures on the initiative petition, but not deciding whether the 1974

or the 1978 gubernatorial election determines the required number of signatures on the petition; and (2) the appeal of the San Diego Apartment Association (Association) and two apartment owners from an order denying Association leave to intervene in the matter, but granting it amicus curiae status. Coalition's petition here asks us to consolidate these matters; to determine the question unresolved below, which election controls; and, by our exercise of original jurisdiction, to eliminate the delay and the multiplicity of litigation which has impeded Coalition's efforts to qualify the initiative for the ballot. This being an election matter raising significant questions of statewide importance in the interpretation of laws governing the initiative procedure, our exercise of original jurisdiction is particularly appropriate. (*Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565, 570, fns. 1, 2 [96 Cal.Rptr. 697, 488 F.?d 1]; *Perry* v. *Jordan* (1949) 34 Cal.2d 87, 90-91 [207 P.2d 47].)

The facts are: Coalition is an unincorporated association of individuals, most of whom are registered voters and residents of the City of San Diego, who circulated an initiative petition to amend the city charter by establishing local rent control boards. The requirements for amending a city charter by initiative are contained in Government Code section 34459 et seq.[1] In essence, to qualify for the ballot such a petition must be signed by 15 percent of the registered city electors, computed "upon the total vote cast for all candidates for Governor in the city . . . at the last preceding general state election at which a Governor was elected." (Gov. Code, § 34462.) Further, such petitions must be filed with the governing body of the city not less than ninety days before a statewide general election, and not more than one year after the date of the first signature on the petition. The statutes mandate signature verification at the public expense, and submission to the voters of qualified petitions.

---

[1]Section 34459. "The charter of any city may be amended or repealed by proposals submitted by the governing body on its own motion or by petition signed by 15 percent of the registered electors, or both."

Section 34460. "Petitions for the submission of any amendment or petitions for the repeal of a charter shall be filed with the governing body of the city or city and county not less than 90 days prior to a statewide general election and not more than one year after the date of the first signature affixed thereon. The signatures on such petitions shall be verified by the authority having charge of the registration records of the city or city and county, and the expenses of such verification shall be provided by the governing body thereof. The signatures may be verified by means of the random sampling technique as provided for in Elections Code Section 3708."

Section 34462. "The percentages of the registered electors required for the election of charter commissioners or the submission of amendments to charters or the proposal for charter repeal shall be calculated upon the total vote cast for all candidates for

Hoping to qualify for the November 1978 general election, Coalition began collecting signatures April 24, 1978. After obtaining about 40,000 signatures it filed the petition with City on August 8, 1978. However, City determined only 28,454 of the signatures were valid, but, based on the 1974 electoral tally, 35,801 were needed. On August 28, 1978, City told Coalition its signatures were insufficient. Coalition then resumed collection of signatures. The November 1978 general election occurred. Then on April 5, 1979, still within 1 year of the date of the first signature on the petition, Coalition tendered to City an additional 15,000 signatures which it had collected to supplement the original 28,454.

City refused to accept the supplemental petition, taking the position the Government Code does not authorize supplementary filings. Coalition sought a writ of mandate in the superior court to compel City to accept the supplemental petition and count the signatures. During this procedure, Association moved to intervene. The trial court denied its motion, but permitted it as an amicus curiae to file briefs and be heard in argument. The court then gave judgment for a writ of mandate compelling City to accept the supplemental petition and count the signatures. City appeals that judgment. Association independently appealed the order denying intervention.

Since City's appeal from the judgment for mandate did not automatically stay its effect,[2] City was under an immediate obligation to begin verifying the signatures. It then asserted its position that the 1978, rather than the 1974 election, controlled the required number of signatures, which Coalition disputed. The superior court declined to decide the question because it viewed City's appeal as having divested the superior court of further jurisdiction over the matter. Accordingly, Coalition's petition for mandate here raises that question.

It is not disputed if the 1974 election controls, 35,801 signatures are required, but if the 1978 election governs, then 41,069 are needed. The record does not indicate how many of the 15,000 supplemental signatures are valid.

---

Governor in the city or city and county at the last preceding general state election at which a Governor was elected. The election laws of such city, or city and county shall, so far as applicable, govern all elections held under the authority of this chapter."

[2]City filed a petition for supersedeas in this court to stay the judgment for mandate, which we denied.

The issues these consolidated matters present are (1) whether an insufficient initiative petition may be supplemented with additional signatures after the election for which it was first submitted has occurred, yet within a year of the first signature; (2) whether an election occurring during the period of circulation of an initiative petition affects the required number of signatures; (3) whether Association should have been permitted to intervene, and if so, whether the failure to grant intervention requires reversal of the judgment.

We conclude, for reasons we shall state, the supplemental petition procedure used here is valid; the election establishing the number of required signatures is the last election before circulation of the petition began, here, the 1974 election; and finally, Association had no right of mandatory intervention; the trial court did not abuse its discretion in denying permissive intervention; and even if Association had some right to participate in this lawsuit, the broad participation permitted it in the trial below fully satisfied that right, so that denial of the intervention motion was not prejudicial.

DISCUSSION

I. *Supplemental Petition*

█ The Government Code sections relevant to this matter, sections 34459, 34460 and 34462, neither forbid nor authorize the supplementing procedure used here. City argues the absence of authorizing language makes the procedure impermissible. This argument is untenable. Many matters affecting submission of initiative petitions are not set out in the statutes, including questions of number and size of pages, color of ink, and other matters, whether formal or trivial. Whenever the proponents of an initiative petition and the city clerk disagree about a regulation not expressly set out in a statute, the question is whether such regulation furthers or impedes the statutory purpose. We take it City would be first to agree the signatures on the petition be legible, even though that requirement is not set out in so many words. Similarly, the lack of specific authorization for the supplementing petition is not necessarily controlling.

Further, philosophically, the cases provide the initiative power being reserved by the people, rather than granted to them, is "one of the most

precious rights of our democratic process." (*Mervynne* v. *Acker* (1961) 189 Cal.App.2d 558, 563 [11 Cal.Rptr. 340].) Statutes regulating that power are liberally construed in favor of its broadest exercise, or put another way, restrictions on the right are not read into the statutes. (See *Fair Political Practices Com.* v. *Superior Court* (1971) 25 Cal.3d 33, 41 [157 Cal.Rptr. 855, 599 P.2d 46]; *Mervynne* v. *Acker, supra,* 189 Cal.App.2d 558, 563-564; *McFadden* v. *Jordan* (1948) 32 Cal.2d 330, 332 [196 P.2d 787]; *Ley* v. *Dominguez* (1931) 212 Cal. 587, 593 [299 P. 713]; *Blotter* v. *Farrell* (1954) 42 Cal.2d 804, 809 [270 P.2d 481].) Thus in *Blotter* v. *Farrell, supra,* 42 Cal.2d 804, the issue was whether, when the statute provided for the filing of a supplemental petition within a stated time after notice of insufficiency, a supplement might also be filed to convert a "10 percent" petition to one signed by 15 percent of the electorate. The court there found the procedure permissible since the statute did not appear to prohibit it. City argues *Blotter* is inapposite because there the statutes expressly authorized the supplemental petition procedure in one situation, while here they do not. Nevertheless, the cases are identical in the absence of express authorization for the supplementation attempted. The approach of the court in *Blotter* to statutes of this kind permits the procedure here unless it would emasculate the purposes of the initiative or severely burden City.

Another example of the correct construction of initiative regulations is *Ferrara* v. *Belanger* (1976) 18 Cal.3d 253 [133 Cal.Rptr. 849, 555 P.2d. 1089]. There a statute (Elec. Code, § 4017) permitted proponents of an initiative measure to "file with the petition a written argument in favor of the ordinance." The city clerk refused to accept ballot arguments presented after a petition had been filed, by both its initial proponent and another person. The city there, as here, contended statutory authorization was lacking. The court, however, held the permissive statute did not preclude other procedures and the city should have accepted both ballot arguments. The decision was based partly on the existence of other statutes which established a general procedure for submission of ballot arguments for "city measures" (Elec. Code, §§ 5010-5014), but rested also on the mandate of liberal construction of initiative regulations as specified in the original 1911 legislation stating, "'All the provisions of this statute are to be liberally construed for the purpose of ascertaining and enforcing the will of the electors.'" (Stats. 1911, Ex. Sess., ch. 33, § 1, p. 133, cited in *Ferrara* v. *Belanger, supra,* 18 Cal.3d 253, 263.) Similarly here, City's restrictive interpretation of the statutes is not warranted; permission to file a petition does not necessarily forbid supplementation.

City also argues other statutes regulating initiative procedures once provided for supplemental filings, but have since been amended to eliminate supplementation at about the same time as the charter city statutes here were enacted in their present form.[3] The argument is, the deletion of supplemental filings in one instance, coupled with omission of the procedure in another, indicates contemporaneous legislative intent to preclude the practice altogether. The problems with that argument are, first, it has not been demonstrated that the omission of the earlier supplemental filing provisions precludes such filings; it may instead permit unrestricted supplementation. Second, we see no evidence of uniformity, or even similarity, among the various provisions regulating the initiative power. Thus the provisions regarding charter cities are in a different code than those affecting counties and general law cities. Another statute, governing exercise of statewide initiative petitioning power (Elec. Code, § 3520), is somewhat different from any of these. As an example of differences among the statutes which may or may not be helpful, we note both the county and general law city statutes, Elections Code sections 3706 and 4008, contain language which requires all sections of the petition to be filed "at one time" and which further provides "[a]ny sections of the petition, not so filed, shall be void for all purposes." It is possible, although not unambiguous, this language precludes supplemental filings under these statutes. This language does not appear in the charter city initiative requirements. A modified form of the language appears in the context of statewide initiative filings, where, under Elections Code section 3520, the petition is separately circulated in counties or cities, and all sections circulated in each geographic unit must be filed at the same time. This section does not contain the "void for all purposes" language. The lack of uniformity among these various statutes and procedures makes inferences based on differences in statutory language highly speculative. If we were to accept the position of City and Association that the quoted language from the Elections Code regarding filing all sections at one time precludes supplemental filings, then we could infer, as Coalition argues, that the absence of such language from Government Code section 34459 et seq., for charter city initiatives indicates implied permission to supplement.

[3]Thus, Elections Code section 3705 regulating county initiatives, and Elections Code section 4008 governing general law city initiatives, were both amended in 1969 to delete earlier provisions which had permitted supplemental filings within stated periods after receipt of the notice of insufficiency. (See Stats. 1969, ch. 940, §§ 1, 4, pp. 1877-1878; cf. Stats. 1961, ch. 23, pp. 630, 635; Stats. 1967, ch. 1148, § 12, p. 2826.) Shortly after these changes, the present charter city initiative regulations, Government Code section 34459 et seq., *supra*, were enacted. (Stats. 1969, ch. 1264, eff. June 2, 1970.)

Such interpretation is at least as probable as the conclusion the Legislature intended to preclude supplemental filings of charter city initiative petitions, because it has forbidden supplementation elsewhere.

Although no case addresses the question directly, we note a recent case where the parties had stipulated to submission of a supplement to an initiative measure, and no issue was made of the use of the procedure. (*San Rafael Fireman's Assn.* v. *City Council* (1980) 105 Cal.App.3d 358 [164 Cal.Rptr. 376].) The facts of that case indicate at least one California city does not regard the statutes as precluding supplementation of initiative petitions, nor did the appellate court reviewing the matter discern any illegality in the procedure. Thus the procedure may not be so outrageous and unheard-of an innovation as City and Association here suggest.

City also offers arguments based on the provision permitting it to use a random sampling technique in verifying signatures. That technique is described in Elections Code section 3708, which is incorporated by reference into Government Code section 34460, authorizing use of the technique on charter city initiatives. The random sampling technique requires there be more than 500 signatures signed on the petition; if so, then a random sample must be examined in such manner that every signature has an equal opportunity of inclusion in the sample, and at least 500 signatures or 5 percent of the total signatures, whichever is greater, must be examined. If the sampling shows the number of valid signatures to be within 90 to 110 percent of the required number, then the clerk must examine and verify each signature filed. City argues such a technique cannot be used if the petition is filed in installments; hence, the Legislature, having allowed use of the technique, cannot have intended to allow supplemental filings, and further, even if this be not true, it greatly burdens and inconveniences City to have to forego the random sampling technique. None of these arguments appear to us to be valid. First, use of the random sampling technique is not mandatory. Next, the record does not contain evidence of cost comparisons establishing what additional burden, if any, would be involved in foregoing the technique in cases of supplemental filings on account of insufficiency. Third, even assuming increase in burden, it is not apparent the technique cannot be used in supplemental filing situations, first as applied to the initial filing which will clearly have more than 500 signatures, and then on the augmented petition when the supplement is offered. There is clearly some increase in time to sample 2 petitions rather than 1, but the burden is not shown to be materially greater than

if the entire petition were refiled anew after Coalition had reobtained the original 40,000 signatures plus 15,000 more. Comparing the slight increase in burden to City of having to apply the technique twice, to the immense burden on Coalition of having to regather all those signatures, the hardship appears decidedly to weigh against Coalition.[4]

As the trial court said: "While there are practical problems with the procedure and some additional work for the Clerk, as pointed out by the opponents of the initiative, when weighed against the policy considerations of preserving to the people the right of initiative, they are small indeed."

## II. *Effect of Intervening 1978 Election*

Again, the statutes are ambiguous whether the election determining the required number of signatures is the last election before presentation of the petition for filing, or the last election before circulation of the petition begins, or, as a third possibility, the last election before the petition is finally determined to qualify. (See Gov. Code, § 34462, *ante*, fn. 1, referring to "the last preceding general state election at which a Governor was elected.") There is no controlling authority. The case of *Gage* v. *Jordan* (1944) 23 Cal.2d 794 [147 P.2d 387], dealt with an earlier version of the state initiative procedure, former California Constitution, article IV, section 1.

That case is helpful in analyzing these issues.

## A. *Whether Intervening Elections Cause the Petition to Be Void*

We here address an argument City did not make, but which is probably the strongest point it might have urged, namely, whether an initiative petition survives the election for which it was first submitted.

In *Gage* v. *Jordan, supra*, 23 Cal.2d 794, the court had to interpret constitutional provisions for exercise of statewide initiative power. The specific provision, former California Constitution, article IV, section 1 provided in essence, upon presentation to the Secretary of State of a pe-

---

[4]It has been pointed out the enormous expense of collecting signatures for initiative petitions has all but priced public interest nonprofit groups out of that procedure, even though the initiative was originally provided for in 1911 as part of a populist movement designed to preserve the power of such groups to counter wealthy lobbyists. See *The California Initiative Process: A Suggestion for Reform* (1975) 48 So.Cal.L.Rev. 922, 943-944.

tition certified to have been signed by qualified electors equal in number to 8 percent of the votes cast for gubernatorial candidates "at the last preceding general election," the Secretary of State "shall submit" the proposition to the electorate "at the next succeeding general election occurring subsequent to 130 days after the presentation aforesaid of said petition . . ." or at any sooner special election called by the Governor in his discretion. That provision was part of a larger scheme with a number of rigorous time deadlines. Petitions were circulated in counties or cities. Although circulation in sections was permitted, all sections within each geographic unit were to be presented at the same time and the signatures had to be checked within 20 days. Then the clerk was to "forthwith" transmit the petition to the Secretary of State, who should likewise "forthwith" transmit his certificate of receipt. Supplemental petitions could be filed with the local official within 40 days of transmission of the petition to the Secretary. Ten days were allowed to verify supplemental signatures. Then the above-quoted language came into play, requiring placement of qualified petitions on the ballot "at the next succeeding general election" more than 130 days after presentation. Another provision stated in certain specific instances where negligence or malfeasance had occurred, initiatives not submitted "at the election specified" might be submitted at a later general election.

The court had to determine what constituted "presentation" and what base election determined the number of signatures needed to qualify. The factual context involved a petition submitted for the 1940 election, which had failed to qualify. At the next election in 1942, fewer electors voted. Based on that election, the petition had enough signatures. The issue was whether the petition could then be submitted to the voters at the next election, presumably 1944, or whether it had no further life after failing to qualify in 1940. The court's holding was it could not be resubmitted at any later election than 1940, or as the court said, it could not be "revitalized." The reasons the court gave for that conclusion were the time limitations and the overall structure of the relevant provisions necessarily implied a limited life for the petition, bounded by the occurrence of the "next succeeding general election" more than 130 days after presentation. (That concept was further defined as the date the first section was filed with the Secretary of State.) The legislative intent was a petition was presented for one, and only one, particular election and had to qualify for that election alone, based on the number of electors voting in the immediately previous election, i.e., the election

before presentation. Such a result, according to the court, maximized the probability an initiative petition submitted at election A would be supported by a significant percentage of persons qualified to vote at election A. The petition would have sufficient contemporaneous support. "In other words, it is intended that the signers of the petition shall be qualified electors at the time of signing and that the measure shall be submitted at the *next* general election, at which they are qualified to vote. As electors change each year, through death, coming of age, removal, neglect to qualify, and the like, any construction of section 1, *supra*, which would permit the qualified electors of one year to determine largely the measures liable to go on the ballot in a subsequent year would lead to confusion and uncertainty, and would be contrary to public policy." (*Gage* v. *Jordan, supra*, 23 Cal.2d 794, 804.)

The situation presented to the court in *Gage* differs from that here because here the applicable statutes have different time limits. The only express limits here are submission ninety days before an election and filing within one year of the date of the first signature on the petition. Therefore, here the one-year requirement ensures currency, unlike the facts in *Gage.* However, in a broader sense such a result could be inconsistent with the Supreme Court's analysis in *Gage* that the Legislature intended an initiative measure to be submitted for a particular election. *Gage* implied that analysis from the nature of the initiative process and the existence of applicable time limits. Also, in *Gage* a specific statutory exception permitted submission at a later election, when the petition had not appeared on the ballot due to oversight: The exception indicated a general rule of one-time only submission, that kind of statutory exception is absent here. However, both at bench and in *Gage*, we have a time-limited procedure which can sensibly be viewed as directed to a particular election and no other. Or, putting the matter in terms of the present facts, the initiative petition here was submitted for the 1978 election. Its fate should be limited to qualifying for that election, based on the 1974 electoral tally. When it failed to qualify by 90 days before the 1978 election, it was dead for all purposes. It could not be supplemented, not because supplementation is itself unauthorized, but rather because it had missed the election for which it was submitted, just as occurred in *Gage.* Compare the following language in *Gage*: "The measure here under consideration was initiated with the intent that it should appear on the 1940 ballot. Since that year, there has been a drastic change in economic conditions, the nation has found itself in an exhaustive war, vast numbers of the people have surged to the western coast and many others have been removed .... It may safely be as-

sumed that many who signed as sponsors of the measure might refuse to sign were it submitted to them today, and the present electorate should not be burdened with their undertaking...it is not only reasonable, but desirable to limit the time for the qualification of initiative measure ...." (23 Cal.2d at p. 805.)

In our mind, the critical factor which requires a different result here than in *Gage* on the issue whether the petition survives the first election for which it might have qualified, is the absence of statutory time limits on the verification process, limits which were present in *Gage*. If we were to construe the charter city initiative provisions here as requiring qualification for one specific election and only one, then the city clerk, limited by no express time restriction within which to verify signatures, could effectively destroy any initiative measure which was insufficient on first filing, by simply delaying the verification until it was too late to supplement the petition. Such delay need not be purposeful, of course, but could simply result from routine priorities in processing of work within the city clerk's office or possibly neglect or inadvertence. Any factor which thus prolonged the verification time until a point less than ninety days from the next election would effectively kill the measure, which could not then be supplemented in time for that election, even though the supplementation could otherwise occur well within the one-year requirement from date of first signature. In *Gage* that result could not have occurred because the entire verification and supplementation procedure could take no more than 70 days from first filing of sections of any petition with the county clerk. (*Gage* v. *Jordan, supra*, 23 Cal.2d 794, 802.)

If we were to adopt a construction of the provisions parallel with that in *Gage* requiring submission for one election only, the practical result would be proponents would begin circulating and would submit petitions as far in advance of a given election as possible to permit time for supplementing, if needed. That result frustrates the policy of keeping circulation time close to the election in which the electors will vote on the measure. One could adopt City's position that no supplementation is ever permitted; but that position, as stated, imposes a heavy burden on proponents of initiative measures, which in our view is not warranted absent express statutory requirement.

We conclude, the provisions here scrutinized impose a specific time limit of one year upon initiative petitions to amend city charters and the

surrounding scheme of legislation does not warrant the imposition of implied limitations, such as that found to exist in *Gage*. We hold therefore, that although submitted for a given election, a charter city initiative petition may nonetheless be supplemented with an eye to qualifying for the next election, provided the filing is completed within one year from obtaining the first signature.

### B. *Determining the Base Election*

In *Gage*, the base election chosen was the one immediately before first presentation of the petition. "It appears from the foregoing description of the procedure followed . . ., that the base election must be the election preceding the receipt of the petition by the Secretary of State, for otherwise he could never determine whether a petition had, within the time prescribed, the requisite number of signatures. He makes that determination in the only way that he can under the Constitution by ascertaining the total vote for all candidates for governor at the last general election at which a governor was elected preceding the receipt by him of the petition." (*Gage* v. *Jordan, supra*, 23 Cal.2d 794, 812.) The parallel result here would be the controlling election is that preceding first presentation, on August 8, 1978, i.e., the 1974 election.

The opinion of the court in *Gage* established reasonable principles regarding qualification of initiative measures. First, it is logical to use as a base election one occurring before first presentation because otherwise the requirement could theoretically change during the qualification process, slowing up the procedure and requiring recount. Second, public policy favors submission of initiative measures which are demonstrably of current interest to a minimum percentage of the voting public, therefore the statutes must not be construed so as to permit stale measures to go on the ballot. In *Gage*, the time parameters were supplementation within 70 days and placement on the ballot at an election no later than the first election occurring more than 130 days after presentation. Here, if Coalition's interpretation of the statutes prevails, the limits would be presentation within one year of first signature, and base election chosen to be the last election before circulation began. Those time parameters are comparable to those in *Gage*. Although Association and City make much of the "staleness" of the measure if it be based on the 1974 tally, in fact, the change in voting population between 1974 and 1978 does not appear a priori to be so great as to make a petition signed by 15 percent of the 1974 electorate hopelessly out of date in 1980, even in this age of future shock.

A consideration not discussed in *Gage* is the desirability for proponents of an initiative measure to know how many signatures are required before they begin to collect them. As a practical matter such knowledge helps them to determine the feasibility of circulating the petition and also to decide how many extra signatures should be obtained to protect against the possibility of disqualification. It has been noted initiative circulators generally attempt to get about one-third more signatures than are required. (See Note, *The California Initiative Process: A Suggestion for Reform* (1975) 48 So.Cal.L.Rev. 922, 928, fn. 32, discussing the statewide initiative process.) Since the court in *Gage* was not directly confronted with a comparison between using the election before first presentation, and the election before circulation began, it did not address this consideration; but its reason for using the election before presentation, namely, to establish the signature requirement before any verification begins, is also satisfied by using the election before circulation.

 Since we write on a clean slate in interpreting Government Code section 34462 here, we select as the controlling election the last election preceding the date of the first signature on the initiative petition, which is the 1974 election. Using that election satisfies the policy enunciated in *Gage* of establishing the requirement before verification begins, and also places the least burden on the initiative process compatible with the statutory language, in keeping with the approach of *Blotter* v. *Farrell, supra*, 42 Cal.2d 804, and like cases discussing the initiative right. Further, the time limitations built into the statutes ensure initiative petitions will not exist indefinitely and will be based on a reasonable showing of current interest, compatible with the policy expressed in *Gage*.

To illustrate our interpretation: if a proponent began to collect signatures the day before a general gubernatorial election and submitted the petition to the city 364 days later (i.e., one year after that election), then, since no supplemental filings could be timely, the measure would either stand or fall on the number of signatures then collected and, if it qualified, it would go on the ballot, assuming elections every two years, one year later. The total time elapsed from circulation to election would be two years. Further, the base election would have occurred, at most, four years before circulation began, assuming gubernatorial elections every four years. The time between base election and submission to the voters would be six years. In our view this is the maximum time which could elapse between base election and submission. Even assuming con-

tinued voting population growth, a hypothesis not proved in this record, we do not believe as a matter of law such growth would be so rapid as to cause an initiative measure signed by 15 percent of the electorate as it existed six years in the past to be significantly under-representative of current interest. At bench, the difference is 5,268 signatures. Should ·the Legislature disagree with our conclusion, it remains free to specify which election shall control. ■ (The charter city initiative procedure is of statewide concern and subject to regulation by the Legislature. *District Election etc. Committee v. O'Connor* (1978) 78 Cal.App.3d 261, 267 [144 Cal.Rptr. 442].)

■ If in this case more than six years actually elapse between base election and submission to the voters, the additional delay is entirely due to the delaying tactics of City in declining to qualify this measure for the ballot. Under such circumstances it would be highly inequitable to deny the voters an opportunity to vote on this measure because of any "staleness" attributable to that delay. In our view, the measure was timely submitted in two installments, both within one year of the first signature, and City was and remains under a mandatory duty to verify the signatures and to place the measure on the ballot if it qualifies, based on the 1974 electoral tally. Inasmuch as the filing was complete as of April 5, 1979 (the date of the second submission), the measure, if it contains enough signatures, should be placed on the ballot in the November 1980 general election, which is more than 90 days after presentation of the measure as the law requires.

It has been noted there is a premium in resisting initiative measures with delaying tactics, thus dissipating the initial momentum and resources of the proponents and often, when they are short of funds and volunteers, causing the death of the measure. (See 48 So.Cal.L.Rev. 922, *supra*; and *Perry v. Jordan supra*, 34 Cal.2d 87, 91.)[5] One of the special responsibilities of this court is to exercise its original jurisdiction to cut short such delay. (See *Perry v. Jordan, supra*, 32 Cal.2d 87, 90-91.) Although commentators may differ widely about the utility of the initiative power and may indeed take the position it ought to be abolished or severely truncated because of recent abuse (see *supra*, 48 So.Cal.L.Rev. 922), nevertheless, the courts in this state are committed

---

[5]The court commented in *Perry v. Jordan* (1949) 34 Cal.2d 87, 91 [207 P.2d 47]: "To preserve the full spirit of the initiative the submission of issues to the voters should not become bogged down by lengthy litigation in the courts, especially where there is a strong temptation to commence proceedings in the superior court by the opponents of a measure to delay its presentation to the electorate."

to the position "'[T]he right of initiative is precious to the people and is one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter.'" (*McFadden* v. *Jordan* (1948) 32 Cal.2d 330, 332 [196 P.2d 787], quoted in *Perry* v. *Jordan, supra*, 34 Cal.2d 87, 90-91.) As was most recently stated by the California Supreme Court: "'The amendment of the California Constitution in 1911 to provide for the initative and referendum signifies one of the outstanding. achievements of the progressive movement of the early 1900's. Drafted in light of the theory that all power of government ultimately resides in the people, the amendment speaks of the initiative and referendum, not as a right granted the people, but as a power reserved by them. Declaring it "the duty of the courts to jealously guard this right of the people" [citation], the courts have described the initiative and referendum as articulating "one of the most precious rights of our democratic process" [citation]. "[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right be not improperly annulled. If doubts can reasonably be resolved in favor of the use of this reserve power, courts will preserve it." [Citations.]'" (*Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 41 [157 Cal.Rptr. 855, 599 P.2d 46].) In light of these principles we have construed the relevant statutes.

### III. *Intervention*

██ Association and two apartment building owners claim error in denying them the right to intervene. Although denied technical status as parties, they were permitted to file briefs and argue, which they did, and they have also appeared as amicus curiae in this court and filed a lengthy brief in support of City's position.

Code of Civil Procedure section 387, subdivision (a) provides for permissive intervention within the trial court's discretion and subdivision (b) of that statute decrees intervention as of right: "If any provision of law confers an unconditional right to intervene or if the person seeking intervention claims an interest relating to the property or transaction which is the subject of the action and that person is so situated that the disposition of the action may as a practical matter impair or impede that person's ability to protect that interest, unless that person's interest is adequately represented by existing parties . . . ."

Here association has a specific interest in defeating the proposed initiative measure, but it has no different interest in the general question

of interpretation of the charter amendment statutes than does any member of the general public. In past cases such a general interest could only be the basis of permissive intervention within the trial court's broad discretion, not mandatory intervention as of right. (See, e.g., *Socialist Workers etc. Committee* v. *Brown* (1975) 53 Cal.App.3d 879, 892 [125 Cal.Rptr. 915]; cf. under similar federal statute, *Blake* v. *Pallan* (9th Cir. 1977) 554 F.2d 947, 953.) Only direct pecuniary interest formed the basis for mandatory intervention. (See, e.g., such cases relied on by association as *Timberidge Enterprises, Inc.* v. *City of Santa Rosa* (1978) 86 Cal.App.3d 873 [150 Cal.Rptr. 606], where the interveners were the ultimate beneficiaries of certain school inpact fees from developers; compare with *Socialist Workers etc., supra,* where Common Cause was found to have no interest sufficient to intervene in litigation challenging the facial validity of certain political reform legislation.) What is more, the papers filed by Association here and in the trial court indicate no difference between the positions of City and Association. Any contention City does not adequately represent association's interests can only be premised on Association's veiled insinuation that because of budgetary and time constraints the quality of City's legal representation is inferior to that commanded by Association. Even if such contention were true, we do not think such considerations relevant under the statute. The question of law is identity of interest, and here the presence of bias for or against the specific measure in issue does not affect the general question of administration of the initiative procedure on a municipal level, which directly and primarily concerns City, as administrator, and the general public, as repository of the reserved initiative power.

The recent case of *Bustop* v. *Superior Court* (1977) 69 Cal.App.3d 66 [137 Cal.Rptr. 793], has cast some shadow on the above-stated premise that more than general political interest is necessary for mandatory intervention. Nevertheless, that case does not give Association a right to intervene here. First, the parents in *Bustop* concededly had a more direct interest in the question whether their children would be subject to mandatory school busing than has Association in the question whether a rent control initiative should go on the ballot. It is Association's interest in defeating the measure which compares to the interest of the *Bustop* parents, not its stake in regulating initiative measures in general. In *Bustop*, success of the school district or the parties representing minority interests would have directly resulted in the busing of the children, but here, putting the measure on the ballot does not result in rent control without a significant intervening requirement: voter ap-

proval. Hence, the cases are different. Next, *Bustop* arose procedurally in the context of a pretrial writ proceeding, so that the decision to permit intervention occurred before or at an early stage of the trial, not afterward, which would have compelled reversing the judgment and starting over. Here a decision Association should have been allowed to intervene would create great delay and necessitate a wholly new proceeding in the trial court. We do not make such a decision absent a showing of significant prejudice.

This observation leads us to the related questions whether a right of permissive intervention was arbitrarily denied and whether Association was prejudiced. Because we perceive no prejudice whatsoever, we answer no to both questions. As stated, we discern no difference in the positions of City and Association. We note Association has participated in the matter as fully as has City. Association filed a 19-page brief in the trial court as well as an additional brief on the question of the base election, and presented extensive oral argument at both hearings. They have also filed in this court a 28-page brief amici curiae which has been read and considered. Their point of view has been twice heard, being urged with equal zeal by Association and by City. No further participation is required.

*Conclusion*

In case No. 22683 let a writ of mandate issue. The city clerk shall proceed at once to verify signatures on the Fair Rent Initiative petition filed on August 8, 1978, and validly supplemented on April 5, 1979. Qualified signatures are those written by persons who are registered electors at the time they signed the petition. If such signatures constitute 15 percent of the electoral vote from the 1974 election, i.e., at least 35,801 verified signatures, the measure shall be submitted to the voters at the November 1980 general election. The appeal of City in case No. 22252 is dismissed as moot in light of our disposition of the writ of mandate. The order appealed from in case No. 22336 is affirmed. Coalition shall have costs in all proceedings.

Cologne, J., and Staniforth, J., concurred.

A petition for a rehearing was denied July 3, 1980, and the judgment was modified to read as printed above. The petitions of all the appellants for a hearing by the Supreme Court were denied August 20, 1980.