[No. A065620. First Dist., Div. Four. Aug. 16, 1995.]

LAURA MALICK, Plaintiff and Appellant, v.
PATRICIA ATHENOUR, as City Clerk, etc., et al., Defendants and
Respondents.

**COUNSEL**

William Robledo Edgar for Plaintiff and Appellant.

Meyers, Nave, Riback, Silver & Wilson, Andrea J. Saltzman, Steven R. Meyers and Michelle Marchetta-Kenyon for Defendants and Respondents.

OPINION

**ANDERSON, P. J.**—In this opinion we are called upon to determine the appropriate procedure for a trial court to follow when the proponent of a referendum petition challenges by petition for writ of mandate a determination by a county election department that certain persons who signed the referendum petition did not also print their names in a fashion acceptable to the election department.

Here, the trial court denied the writ, finding that the procedures employed by the election officials were reasonable. We find that the trial court foreclosed inquiry into certain matters which might well have affected the court's thinking about the reasonableness of both the procedures and the specific actions of the election department. Accordingly, we reverse the judgment that upheld certain determinations by the Contra Costa County Election Department.

## I. THE INVALIDATION OF SIGNATURES AND THE TRIAL COURT'S REVIEW OF THAT PROCESS

On September 21, 1993, the Danville Town Council adopted ordinance No. 93-8 (the ordinance).[1] Immediately thereafter, Laura Malick (appellant) began circulating a referendum petition, challenging the ordinance.[2] Twenty-seven days later appellant submitted petitions containing 2,956 signatures to Patricia Athenour, Danville City Clerk. Athenour immediately passed the petitions on to Stephen Weir, Contra Costa County Clerk, for verification of signatures. On November 17, 1993, appellant was notified that Weir had determined that appellant's campaign fell 53 signatures short: only 2,344 signatures were "qualified," and 2,397 qualified signatures were required to place the petition before the voters in Danville.[3]

On January 17, 1994, appellant sued Athenour, Weir and the Danville Town Council (collectively, respondents) in Contra Costa Superior Court. Appellant sought a writ of mandate, compelling respondents to find the referendum petition sufficient because 61 of the 612 signatures disqualified

---

[1]The ordinance approved a preliminary development plan for a residential development on a site next to interstate 680 in the Town of Danville and rezoned the site from a general P-1 zoning to a P-1 zoning with certain site-specific criteria.

[2]The referendum petition requested that the ordinance be repealed by the town council or be submitted to a vote of the people at the next qualifying general or special election.

[3]There were 23,962 registered voters in Danville at the time appellant submitted the petition for verification. To qualify for submittal to the voters of Danville, appellant's petition had to be signed by 10 percent of those registered.

by the county election department were improperly invalidated.[4] Respondents filed an answer to the writ petition denying most of the material allegations of the writ petition. Appellant in turn filed a replication to respondents' answer. Appellant and respondents filed memoranda of law and declarations in support of their respective positions.

The most significant declaration submitted by respondents was that of Jeanine Mangewala, a deputy clerk in the election department who conducted the verification process for appellant's referendum petition. Mangewala indicated that she invalidated 69 signatures (including the 45 challenged by appellant) because each of those signers put "no printed name, an illegible printed name or name that was written in cursive" on the line designated for the signer's printed name. In doing so she indicated that she was following "existing Election Department policy" which she "[understood]" was based on the requirements of Elections Code former section 41 (now section 100).

On February 18, 1994, the trial court conducted a limited hearing on the writ petition. The court allowed testimony from only one witness, Jeanine Mangewala. Before Mangewala testified, the court established the parameters for the hearing and the court's decisionmaking process: "In order to have a smoothly functioning machinery here in our county . . . there would be no way that judges could sit and review all of the administrative decisions that are made by city councils, elections departments and other departments. [¶] We have to have certain standards and give certain discretion to competent people, hopefully competent people carrying out their ministerial duties. [¶] So . . . we premised the hearing on this standard, did the person who made the decision act arbitrarily or fraudulently or so unreasonably as to cause this court to overturn the decision making process. [¶] I'm not going to second guess how [Mangewala] went about this or whether I might have done it differently myself, you know, faced with those same signatures. It's on an objective standard given to the court."

Mangewala testified that she automatically invalidated every signature which did not have both "a valid signature" and a "printed name" or a "printed signature." However, Mangewala could not define what constituted a "proper printed signature." She indicated that she resolved each questionable printed-name issue on an individual basis. She also indicated that the

---

[4]Forty-five of the sixty-one signatures appellant contends were improperly disqualified were individuals who wrote their names on the line designated for "[printing one's] name" in a fashion deemed unacceptable by the elections department. In each challenged instance some writing (characters or letters) appears on that line. The bases for the additional 16 challenges are described in part II.C., *infra*.

election department had no written guidelines for determining what constituted a printed name or signature and that she received no training in how to determine whether or not the printing was "sufficient" for department purposes.[5]

On February 23, 1994, the court issued a written decision denying appellant's petition: "Upon review of the relevant evidence including the [declaration and testimony of Mangewala] and Court Exhibit A [the original petition circulated by appellant], the Court finds that the validation process was not unreasonable, arbitrary or fraudulent, and specifically finds that there were [sic] a sufficient number of signatures properly invalidated pursuant to Elections Code Section [105] to cause the non certification of the Referendum petition. The Court further finds that the applicable Election Code Sections are constitutional." Judgment was entered in conformity with the statement of decision. Appellant has appealed from that judgment.

Appellant argues that the trial court erred procedurally in denying her request for a trial to resolve the factual questions raised by the pleadings. She also argues that the trial court reviewed the procedures and the decision-making process of the elections department under an erroneous standard.

We begin our analysis with a review of provisions of the California Constitution and the Elections Code dealing with the referendum process.

## II. ANALYSIS

### A. *The Role of Printed Names in the Referendum Process*

Under article IV, section 1, of the California Constitution, the people reserved to themselves the powers of initiative and referendum. The Legislature has enacted a number of provisions to facilitate the People's exercise of those powers. (*Wheelright* v. *County of Marin* (1970) 2 Cal.3d 448, 455 [85 Cal.Rptr. 809, 467 P.2d 537]). Elections Code sections 105, 9020, and 100 are relevant to our analysis.[6]

Section 105 provides that "[f]or purposes of verifying signatures on any . . . referendum . . . petition . . . the [clerk] shall determine that the

---

[5]Consistent with the announced parameters for review, the court did not allow questions to be asked of Mangewala about changes in election department policy subsequent to her work on appellant's referendum petition, nor did the court permit any testimony about the individual names which were rejected for not having an adequate printed signature. Nor did the court permit the introduction of an exhibit which apparently reflected Mangewala's post-November 17 determinations regarding whether or not the disqualified signers challenged by appellant were, in fact, registered voters.

[6]In 1994 the entire Elections Code was repealed and reenacted with new numbering. (Stats. 1994, ch. 920, §§ 1 and 2). At the time the trial court rendered its decision, Elections Code sections 105, 9020 and 100 were numbered sections 45, 3516 and 41, respectively. We will

residence address on the petition or paper is the same as the residence address on the affidavit of registration. If the addresses are different, or if the petition or paper does not specify the residence address, or, in the case of an initiative or referendum petition, if the information specified in Section 9020 is not contained in the petition, the affected signature shall not be counted as valid . . . ."

Section 9020 provides that "petition sections shall be designed so that each signer shall personally affix all of the following: [¶] (a) His or her signature. [¶] (b) His or her printed name. [¶] (c) His or her residence address . . . . [and] [¶] (d) The name of his or her incorporated city or unincorporated community. . . ." Section 100 also requires that the signer is to "personally affix his or her signature, printed name, and place of residence" to a petition.

■ Respondents argue that a signer's "printed name" constitutes a portion of the "information" required to validate a signature under sections 105 and 9020 and that a signer's failure to print his or her name automatically invalidates his or her signature. Whatever merit there may be to respondents' contention in cases where the signer of a petition puts *nothing* in the space designated for a printed name (an issue we do not reach), we fail to see its merits when a signer does put letters representing his or her name (whether "printed" with each letter separated from the next, written in cursive form, or set out in some combination of printed and cursive styles) in that space.

Here, it is clear from the introductory phrase of section 105 that the purpose of requiring signers of a referendum petition to include their printed names is to assist the election clerk in verifying that the signature on the petition is that of a validly registered voter.[7] To interpret section 105 as requiring a signer to print separately each letter of his or her name would not serve to advance that purpose and would run afoul of the strong judicial policy of resolving all doubts in favor of the exercise of the power of referendum. (*Assembly* v. *Deukmejian* (1982) 30 Cal.3d 638, 652 [180 Cal.Rptr. 297, 639 P.2d 939].)

When that which is set forth in the area designated "Printed Name" does not assist the election department, it is reasonable to require the election department to employ other procedures to determine whether the signature is valid. Although a very efficient procedure was available to Mangewala

refer to the relevant Elections Code sections by their current designations. Unless otherwise noted, all further statutory references are to the Elections Code.

[7]This requirement, thus, is similar to another, since repealed, that the signer include his or her precinct number. (See *Schaaf* v. *Beattie* (1968) 265 Cal.App.2d 904, 908 [72 Cal.Rptr. 79].)

here,[8] Mangewala failed to take advantage of it. When she determined that the "Printed Name" requirement was not satisfied, using no standard for making such a determination other than to make decisions on an "individual basis," she discontinued any attempt to verify the signature and automatically invalidated it. Such action was arbitrary as a matter of law.

In sum, we find that the Elections Code does not mandate the automatic disqualification of an individual who does not print separately each letter of his or her full name when signing a referendum petition.

### B. The Trial Court Either Erred in Its Interpretation of Sections 105 and 9020 or Gave Undue Deference to the Interpretation of the Election Department

■ Neither the judgment nor the statement of decision makes it clear whether the court determined independently that sections 105 and 9020 require the signers of referendum petitions to print separately each letter of their names or whether the court determined that the election department's policy of invalidating the signatures of those whose printing did not meet department (Mangewala's) standards was not "unreasonable, arbitrary or fraudulent." If the court made the former determination, it erred as a matter of law. If the court made the latter determination, it showed undue deference to the election department.

The court's statements at the hearing of February 18th lead us to conclude that the court found *Wheelright* v. *County of Marin, supra,* 2 Cal.3d at pages 455-456, controlling, as respondents suggested it should be in prehearing briefing. In *Wheelright,* our Supreme Court considered the standard of review for a trial court, where a county clerk determines that a *signature* on a referendum petition (not the "printed name") is not that of the voter who signed the registration affidavit. The court defined the duties of the clerk and a reviewing court: "Where the signature on the petition is obviously spurious and is not that of the voter as shown by the registration affidavit, the clerk may and must reject it. He has no discretion to certify a spurious signature. Where there are dissimilarities which are so minor as to make the clerk's rejection of the signature an unreasonable or arbitrary act, the court may not accept the clerk's determination. Where . . . the dissimilarities are not so minor and the similarities are not so great that only one conclusion can be made as to the validity or invalidity of the signature, and where the court

---

[8]In Contra Costa County, an address data base is maintained by the election department. If the address of a petition signer is legible, an election clerk may determine the names of all individuals registered there. The clerk can then compare the signatures on the registration affidavits of voters registered at that address with the signature on the petition in order to determine whether or not the signature in question is a valid one.

finds that in acting upon these dissimilarities and other indicia the clerk was not acting unreasonably or arbitrarily in finding them spurious, the court must accept the clerk's determination . . . . The court in mandamus proceedings may review [the clerk's] certification. Where it finds that the clerk has acted reasonably and has not acted arbitrarily or fraudulently, it must accept his determination." (*Wheelright* v. *County of Marin, supra,* 2 Cal.3d at p. 456.)

*Wheelright* is readily distinguishable from the case at bench. In *Wheelright,* the court found it appropriate to defer to the judgment of the clerk, where the clerk is required to "use his eyesight and critical faculties to determine whether sufficient similarities exist for him to certify" that a signature is a valid one. (*Wheelright* v. *County of Marin, supra,* 2 Cal.3d at p. 456.) Here, the question of the validity of the disqualification of those signers who did not print separately each letter of their names is one of law—an issue to be resolved by the courts. The trial court was not required to defer to the election department's interpretation of the law or the election department's adoption of a policy contrary to law.

## C. *Appellant's Remaining Challenges Must Be Resolved by the Trial Court*

The election department determined that appellant's referendum petition fell 53 signatures short of qualifying for the ballot. The trial court's error, as analyzed in part II.B. of this opinion, affects only 45 signers, which, if all were validated, would still leave appellant 8 signers short of qualifying. However, the petition for writ of mandate also challenged the election department's determinations regarding an additional 16 signers. The trial court did not address those challenges due to its conclusion that appellant's effort to qualify the referendum petition would necessarily fall at least 37 votes short in light of its ruling on the "no printed name" issue.

Appellant's challenges to the remaining sixteen signers fall into four categories: (a) eleven signers appellant claims were, in fact, registered voters in Danville, based on (1) her own review of registration affidavits and (2) Mangewala's alleged admission to appellant that they were registered; (b) one signature that appellant claims was erroneously found by Mangewala to be a duplicate; (c) two signatures that Mangewala allegedly admitted were checked against the wrong affidavit; and (d) one disqualified signature that appellant claims unquestionably matches the signature which appears on the registration affidavit.[9]

Respondents argue that we can and should resolve these claims against appellant. However, we are not in a position to resolve the factual issues

---

[9]The total number of challenges described in appellant's briefs amounts to 15, making a total of 60 disqualifications now seemingly challenged by appellant. The record does not

raised by appellant with reference to those 15 challenges—especially when their resolution may turn on the credibility of witnesses. The trial court is best suited to undertake that task on remand.

### D. *Respondents Have Admitted That the Ordinance Is a Proper Subject for Referendum*

Respondents make one final assertion which merits our attention. They contend that the council's passage of the ordinance constitutes an administrative act and that only legislative acts are subject to referendum. They specifically argue that the two acts undertaken by the council—approval of a development plan and rezoning the site—are solely administrative ones.

■ We find it unnecessary to address the merits of respondents' argument in light of a key admission in their answer: "Respondents admit that they are the City Clerk of the Town of Danville with whom the referendum petition was filed and the Danville Town Council who *must either repeal the ordinance or place it on the ballot if the petition is found to be sufficient . . .*" (Italics added.) Respondents' judicial admission that the effect of the referendum petition, if found to have sufficient signatures, was to require the council to repeal the ordinance or place it on the ballot, removes the question of whether or not the petition addressed a proper subject for referendum from the case. (4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, §§ 408 and 410).[10]

### III. PROCEDURE ON REMAND

Because the petition for writ of mandate, the answer, and the replication raise significant factual issues, appellant should be allowed to present her case pertaining to the 60 or 61 disqualified signatures in a trial format, following remand. (Code Civ. Proc., §§ 1090 and 1094). The fashion in which that trial is conducted rests in the discretion of the trial court. (*Wheelright* v. *County of Marin, supra,* 2 Cal.3d at p. 457.) However, for the benefit of the parties and the court, we note the following: Mangewala's alleged admissions (determinations) that some of the 60 or 61 signers challenged by appellant were, in fact, registered is not rendered inadmissible

reflect a source for the discrepancy between that figure and the figure employed in the petition for writ of mandamus.

[10]We also note that "[n]umerous California cases have settled that the enactment of a measure which zones or rezones property is a legislative act. California courts have so held in cases permitting zoning by initiative [citations], in cases upholding zoning referendums [citations], and in cases involving other issues which distinguish between adjudicative and legislative acts [citations]." (*Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511, 516 [169 Cal.Rptr. 904, 620 P.2d 565].)

because Mangewala made those alleged determinations after the election department prepared its initial certification. The issue is not when Mangewala made those alleged discoveries but whether or not the signers were, in fact, qualified voters at the time they signed the petition.[11]

In the case of the 45 signers who were disqualified due to a failure to "print" their names, the court should verify that the election department has employed its address data base (assuming that the signer's address is legible) to determine whether or not each signer was a properly registered voter at the time he or she signed the petition.[12]

■ The issues raised by appellant require that the trial court examine each of the remaining 15 or 16 names rejected. If the trial court determines that a signer was disqualified in error, the court should reject that disqualification. If the court determines that a signer was disqualified based on the election department's application of a procedural rule adopted by the department, the court must first determine whether or not the rule is lawful. If the court determines that the rule is not lawful, the court must not sanction its enforcement. If the court finds the procedure lawful, the court must still determine whether or not the procedure is reasonable and/or arbitrary. The court is required to defer to a rule or procedure of the election department if and only if the court determines that the rule is reasonable and not arbitrary. If the court determines that the rule is reasonable and not arbitrary, the court must then determine whether or not it was enforced in an arbitrary fashion. If and only if the court determines that it was not enforced in an arbitrary fashion must the court defer to the election department's judgment.

## III. CONCLUSION

The judgment is reversed and remanded for trial. Respondents are to bear the costs of appeal.

Reardon, J., concurred.

---

[11]We also note that respondents assert that six signers withdrew their names before the referendum petition was submitted to the election department. The court should also address that assertion following remand.

[12]In the case of the Contra Costa County Election Department, the burden of checking the address data base will not be a substantial one. The department's existing policy is to check the address data base for all signers found not to be registered in the department's initial check of the petition to be certain that the signer is, in fact, registered. Apparently, the only persons to whom that policy has not been applied are those whose names were not deemed properly printed.

**POCHÉ, J.**—I concur in the judgment of reversal.

The statutory scheme requires that each signer of a referendum must personally affix a printed name as well as a signature and a residence address. (Elec. Code, § 100.) If no printed name appears on the petition the signature cannot be counted valid. (Elec. Code, §§ 9020, 105.) If, however, something appears in the printed name line of the petition which has been put there by the signer of the petition the statutory requirement of providing a printed name has been met.

Apparently all of the signatures which were disqualified because they lacked a printed name did, in fact, have something inscribed in the area reserved for the printed name. There was no evidence that the clerk invalidated any of these signatures on the ground that the printed name had not been personally affixed.

Thus the clerk had no discretion to refuse the signature on the basis that the signer had failed to provide a printed name. A writ of mandate should have issued directing the clerk to count those signatures as valid, unless for some other reason the clerk was unable to verify that the signer of the petition was a registered voter.

A petition for a rehearing was denied September 15, 1995, and respondents' petition for review by the Supreme Court was denied November 22, 1995.