[No. G037690. Fourth Dist., Div. Three. Jan. 16, 2008.]

CAPO FOR BETTER REPRESENTATION, Plaintiff and Appellant, v. NEAL KELLEY, as Registrar of Voters, etc., Defendant and Respondent.

COUNSEL

Mark Rosen for Plaintiff and Appellant.

Benjamin P. de Mayo, County Counsel, and Leon J. Page, Deputy County Counsel, for Defendant and Respondent.

OPINION

SILLS, P. J.—

## I. INTRODUCTION

This case presents an instructive contrast to another election petition case that we publish today, *Preserve Shorecliff Homeowners v. City of San Clemente* (2008) 158 Cal.App.4th 1427. In *Preserve Shorecliff*, there is substantial evidence of reliance by petition circulators on the acceptance by local elections officials of the practice of having petition signers also sign a circulator's affidavit when the circulators do not live in the city involved in the petition. And that evidence was *accepted* by the trial court. Moreover, in *Preserve Shorecliff* the practice relied on was developed in precise response to a facially unconstitutional statute. And the Attorney General had already published an opinion stating that an identical statute in another part of the Elections Code was indeed unconstitutional. (All one would have to do is compare the two statutes to realize that the same went for the statute at issue in *Preserve Shorecliff*.) Under such circumstances, any arguable noncompliance with a requirement that petition circulators themselves had to sign circulators' affidavits could be excused. (See *Assembly v. Deukmejian* (1982) 30 Cal.3d 638, 651–652 [180 Cal.Rptr. 297, 639 P.2d 939].)

Here, we have a different practice. Circulators would fill in signers' addresses for them in a recall election involving multiple targets. There is no substantial evidence of *reliance* on the acceptance of that practice by local elections officials. And any such evidence of reliance was in fact *rejected* by the trial court. Nor is there any hint that the practice of having circulators fill in signers' addresses was developed in response to an unconstitutional statute.

On top of that, the practice of having circulators fill in signers' addresses for them *in a recall petition* substantially circumvents an important statutory protection afforded officials who are the targets of recall petitions—the right to be judged on their own individual merits. That right is expressed in statutes requiring recall petitions be individuated, concerned with a specific official, and which give that official the right to include his or her own *answer* to the recall petition. In other words, recall law requires potential petition signers to be exposed to both sides of the question of whether a specific official should be recalled. The practice of filling in signers' addresses for them after a signer signs and addresses one petition and then hurriedly signs another six petitions effectively obliterates the statutory protections afforded officials as individuals.

## II. BACKGROUND

In the summer and fall of 2005, a group of voters in the Capistrano Unified School District[1] wanted to recall all seven members of the school board. Voters donated countless hours of personal time to collecting signatures for the recall.[2] But the recall never happened because the registrar of voters disqualified signatures where the signers' addresses had been filled in by someone other than the actual signer. This appeal is solely confined to the validity of the registrar's disqualifications.

So, after petition signers signed their names to the multiple petitions and wrote in *one* residence address, volunteers would (helpfully, they thought) fill in the residence addresses for the remaining petitions. At the time the process saved time.

---

[1] Appearing in this case as Capo for Better Representation.

[2] The record indicates the recall was a grass roots, volunteer effort. Hence a little background to the recall is necessary, because it shows the zeal of the recall supporters, which in turn helps explain the main issue in this case: In their enthusiasm, volunteer circulators tried to make things too easy for signers by filling in their addresses for them. So let us merely say that, based on their Internet postings, it appears that proponents of the recall were, among other things, unhappy with a new $52 million district administrative headquarters built when students in the district were still attending classes in classrooms that look like glorified Quonset huts.

Beyond that, we should not comment further, since there is the possibility of further litigation that might reach this court arising out of the grounds for the recall and the district's reaction to it.

The problem was, cutting that corner violated at least two California statutes. Those statutes, Elections Code sections 100[3] and 11043,[4] practically duplicate each other, and both plainly require that each signer of a recall petition *personally* "affix" his or her residence address to a recall petition. Disallowing signatures where signers hadn't themselves actually filled out the address box meant that none of the recall petitions had the requisite number of signatures (20,421). Recall supporters then filed this proceeding in superior court seeking a writ requiring the registrar to count the disputed signatures. After the trial court entered a judgment formally denying the request, this appeal followed.

---

[3] Here is the text of Elections Code section 100:

"Notwithstanding any other provision of law, whenever any initiative, referendum, recall, nominating petition or paper, or any other petition or paper, is required to be signed by voters of any county, city, school district, or special district subject to petitioning, only a person who is an eligible registered voter at the time of signing the petition or paper is entitled to sign it. *Each signer shall* at the time of signing the petition or paper *personally affix his or her* signature, printed name, and *place of residence, giving street and number, and if no street or number exists, then a designation of the place of residence which will enable the location to be readily ascertained.* A space at least one inch wide shall be left blank after each name for the use of the elections official in verifying the petition or paper. The part of a petition for the voters' signatures, printed names, and residence addresses and for the blank spaces for verification purposes shall be numbered consecutively commencing with the number one and continuing through the number of signature spaces allotted to each section. The petition format shall be substantially in the following form:

| | | Official Use Only |
|---|---|---|
| (Print Name)<br><br>1. _____<br>(Signature)_____ | (Residence Address ONLY)<br><br>_____<br>(City)_____ | |
| (Print Name)<br><br>2. _____<br>(Signature)_____ | (Residence Address ONLY)<br><br>_____<br>(City)_____ | " |

[4] Elections Code section 11043 governs the design of recall petitions. Subdivision (a) provides: "The petition sections shall be designed so that *each signer shall personally affix* all of the following: [¶] . . . [¶] (3) *His or her residence address*, giving street and number, or if no street or number exists, adequate designation of residence so that the location may be readily ascertained." (Italics added.)

All further undesignated statutory references will be to the Elections Code.

## III. DISCUSSION

### A. No Excusable Reliance

Recall supporters argued to the trial court and again on appeal that employees of the registrar's office told them the practice of writing in signers' addresses was permissible.

The evidence on that point was *at best* contested. At least two employees of the registrar's office unequivocally declared that recall supporters would have been told no such thing, as a matter of policy.[5] We say *at best* contested, because the trial judge doubted that the declarations submitted by recall supporters even supported the idea that they had been told by the registrar's employees that it was okay to copy addresses.[6]

In any event, though, even if those declarations did provide an evidentiary basis for some sort of reliance argument, the presence of substantial evidence in the form of the unequivocal denials from the two employees is sufficient to dispose of the issue.

Pointing out that the trial court did not actually receive any *testimony* on the evidence proffered on the reliance issue, the recall supporters assert that they, rather than the party prevailing on appeal, should receive the benefit of any conflicts in the evidence, such as would be the case in a summary judgment motion.

■ The argument fails because the trial court disposed of the case in a proceeding for traditional mandamus under section 1085 of the Code of Civil

---

[5] From the declaration of Marcia Nielsen of the voter services unit: "In her declaration [recall supporter Connie] Lee stated that 'everyone [she] asked' at the Registrar of Voters' office said that the Registrar 'only looks at the signature to see that the petition signature and the signature on the voter registration record match.' Though I do not know who, specifically, Ms. Lee asked, Ms. Lee's statement is not an accurate representation of what she would have been told, either by me, or by any other employee of the Registrar of Voters." Suzanne Slupsky, election services manager, who had many conversations with recall supporter Kevin Murphy, said, "I never told Mr. Murphy that circulators could fill in the personal information of the signers. I would not make such a statement . . . ."

A third employee related the hearsay from a candidate for the local central committee of a political party that the proponents of the recall "knew it was wrong" for circulators to fill in addresses, but did it anyway. We do not count this last declaration as *substantial* evidence of anything.

[6] The trial judge described the declarations as "somewhat ambiguous." That ambiguity made him "not exactly sure" they had even "presented an evidentiary basis for estoppel argument." In that regard, on appeal the registrar analyzes those declarations with a view to showing that they don't actually provide evidence that the registrar or his employees told recall supporters they could fill in the names and addresses of signers. We need not explore that analysis here since the registrar's own declarations are substantial evidence that recall supporters were never told what they asserted they had been told.

Procedure. Such a proceeding is, in substance, a trial to the court, as distinct from a pretrial summary judgment motion. The case law is well established that in a proceeding for a writ of mandate, when the matter is heard only on written evidence, all conflicts in the written evidence are resolved in favor of the *prevailing* party, and factual findings are examined for substantial evidence. (E.g., *Appelgate v. Dumke* (1972) 25 Cal.App.3d 304, 311, 307 [101 Cal.Rptr. 645] [in case where trial court denied petition for writ of mandate "receiving evidence in the form of declarations and depositions," facts had to viewed "in the light most favorable to the findings of fact of the trial court"]; *W. W. Dean & Associates v. City of South San Francisco* (1987) 190 Cal.App.3d 1368, 1371 [236 Cal.Rptr. 11] [testing trial court decision on writ of mandate to prohibit a referendum election on substantial evidence standard with facts "viewed in the light most favorable to the findings of the trial court"]; accord, *Lynch v. Spilman* (1967) 67 Cal.2d 251, 259 [62 Cal.Rptr. 12, 431 P.2d 636] ["When an issue is tried on affidavits, the rule on appeal is that those affidavits favoring the contention of the prevailing party establish not only the facts stated therein but also all facts which reasonably may be inferred therefrom, and where there is a substantial conflict in the facts stated, a determination of the controverted facts by the trial court will not be disturbed."].)

### B. No Actual Compliance

■ The text of both sections 100 and 11043 is inescapable: Both statutes refer to "each signer," and use the active voice in describing the requirement of personally affixing the residence address.

The Legislature could have used the vaguer, passive voice for the residence requirement (e.g., "Each signer will personally sign the petition, on which the residence of the signer shall be printed") and in fact it *did* use the passive voice for another requirement set forth in section 100 (the need for the consecutive numbering in the format of the petition).[7] But it did not use the passive voice for the affixation-of-residence requirement. The contrast in voices underscores the intent of the Legislature for personal affixation by "each signer" of his or her residence address.

Confirming that reading, both statutes also use the word "shall," which is a mandatory usage, as distinct from a permissive one, and particularly in the context of this exact language. (*Assembly v. Deukmejian, supra*, 30 Cal.3d 638, 648 [holding that election statute requiring that petition sections " 'shall

---

[7] Section 100 reads: "The part of a petition for the voters' signatures, printed names, and residence addresses and for the blank spaces for verification purposes *shall be numbered consecutively* . . . ." (Italics added.) That is to say, in contrast to the writing in of the residence, the Legislature didn't care *who*, precisely, does the numbering.

be designed so that each signer shall personally affix his or her' " residence address was so " 'clear' " as to not be subject to " 'liberal construction' "]; see also *Jones v. Catholic Healthcare West* (2007) 147 Cal.App.4th 300, 307 [54 Cal.Rptr.3d 148] [general rule that "Courts routinely construe the word 'may' as permissive and words like 'shall' or 'must' as mandatory."].)

■ Boxed in by the text of sections 100 and 11043, the recall supporters rely on another statute in the Elections Code, section 100.5, as specifically allowing nonsigners to fill in signers' addresses.[8] The statute allows a petition signer to make a mark or signature but also allows the signer to request "another person to print the voter's name and place of residence on the appropriate spaces of the petition or paper." (§ 100.5.)

The statute, however, was plainly designed for disabled voters, as revealed in the critical introductory clause ("Notwithstanding Section 100, a voter who is unable to personally affix on a petition or paper the information required by Section 100 . . . .").

That plain meaning is confirmed by section 100.5's legislative history. The Senate Rules Committee analysis of the final version of Senate Bill No. 1853 (1995–1996 Reg. Sess.) as amended August 15, 1996, that gave rise to section 100.5 showed that the Legislature had in mind *disabled* voters—not voters too busy to write in their addresses. ("This provision is to insure that disabled voters may fully participate in all aspects of the democratic process." (Sen. Rules Com. Office of Sen. Floor Analyses, analysis of Sen. Bill No. 1853 (1995–1996 Reg. Sess.) as amended Aug. 15, 1996).)[9]

In the context of the statute, it would be unreasonable to stretch the word "unable" to include harried shoppers who simply do not want to take the time to write in their residence addresses six more times. To do so would be to allow the exception in section 100.5 to obliterate the rule in section 100.

Indeed, not only does section 100.5 not support allowing nonsigners to write in residences on petition forms, it affirmatively refutes it. The fact that the Legislature sought fit to make an *exception* to the "information required by Section 100," which includes all three items listed in section 100, not

---

[8] Section 100.5 reads in full: "Notwithstanding Section 100, *a voter who is unable to personally affix* on a petition or paper the information required by Section 100 may request another person to print the voter's name and place of residence on the appropriate spaces of the petition or paper, but the voter shall personally affix his or her mark or signature on the appropriate space of the petition or paper, which shall be witnessed by one person by subscribing his or her name thereon." (Italics added.)

[9] We grant the registrar's request to take judicial notice of the document.

just the signature, confirms the plain meaning of section 100. Each *nondisabled* signer must personally affix his or her residence address as well as signature.[10]

### C. No Substantial Compliance

We stress the context of this case: We are not dealing with situations involving elderly or disabled voters (who might need assistance in, literally, writing in their addresses), nor are we dealing with the proposed recall of a single official. This case involves petition circulators writing in signers' addresses for them on multiple recall petitions for *different* officials. In essence, petition signers were first personally signing and addressing *one* petition, then quickly signing six other petitions leaving the addresses blank. It was as if signing and addressing *once* was considered good enough for all seven.

■ The statutes governing recall elections in California (§ 11000 et seq.) unmistakably preclude the en banc recall of groups of officials. There must be a separate petition for every official sought to be recalled. (§ 11044 ["Separate petitions are necessary to propose the recall of each officer."].)[11]

Furthermore, officials also have the right to individually file an answer to the recall petition (albeit of not more than 200 words). (§ 11023.)

The requirement that individual officials be given the right to individually answer a recall petition is nothing more than common sense. Just as the law allows codefendants in a civil or criminal case to present their own, individual, defenses, it also allows for officers who are the targets of recall efforts to do the same.

■ We have already established that, coming to this court from a court trial, all conflicts and inferences must be resolved in favor of the judgment. One of the inferences that may be reasonably drawn from the judgment is

[10] Section 100.5 also refutes the recall supporters' sideways lack-of-standing argument that the registrar is legally required to be concerned only with the validity of signatures. Section 100.5 shows us that the Legislature lumped the three requirements of a signature, address and printed name all under the rubric, "the information required by Section 100." There is nothing in the text to suggest that the relevant elections official should be concerned with only one item on the enumerated list, but not the other two.

[11] Hence the statutory scheme also speaks of the "officer sought to be recalled" in the singular numerous times. (E.g., § 11006 ["any elective officer"]; § 11007 ["an officer"]; § 11020 ["the officer sought to be recalled"]; § 11021 ["the officer sought to be recalled"]; § 11022 ["the officer sought to be recalled"]; § 11023 ["the officer sought to be recalled"]; § 11041, subd. (a)(3) [providing for individual answers from "the officer sought to be recalled" on the recall petition].)

this: All board members were being lumped together as one. After all—if signers cannot take the time merely to personally write in their own addresses (again, we stress that we do not deal with a case involving disabled signers, as contemplated in § 100.5) for the recall petitions of the remaining board members, they certainly were not reading the answers of those members. The practice simply crosses the line from being an essentially harmless goof that courts may legitimately excuse (e.g., *Costa v. Superior Court* (2006) 37 Cal.4th 986, 1028–1030 [39 Cal.Rptr.3d 470, 128 P.3d 675] [nonsubstantive discrepancy in text submitted to Secretary of State from text submitted to Attorney General]) to one that thwarts important rights and statutory protections.

The two substantial compliance cases mainly relied on by the recall supporters, *Nelson v. Carlson* (1993) 17 Cal.App.4th 732 [21 Cal.Rptr.2d 485] and *Malick v. Athenour* (1995) 37 Cal.App.4th 1120 [44 Cal.Rptr.2d 281], are distinguishable.

As to *Nelson*, the supporters rely on dicta in a footnote. It is dicta because the case actually held that failure to attach an exhibit containing the city's general plan to a referendum petition on a local land use resolution was substantial compliance, but fatal. (See *Nelson v. Carlson, supra*, 17 Cal.App.4th at p. 741, fn. 6.) The point of the dicta in the footnote was that (1) use of a draft version of the resolution that was the subject of the referendum could not invalidate the referendum because the differences between the draft and final version were "insignificant"; and (2) a requirement that *circulators* give the dates between which signatures were obtained could not invalidate the referendum because the "apparent purpose" of the requirement was still fulfilled by using date stamps. The use of date stamps did not impede the city clerk in her duties of ascertaining that the signatures were obtained in the proper timeframe and in determining whether signers were also registered voters. (Since voters regularly change residences, the date of a signature helps ascertain whether a voter is registered.) *Nelson* is simply a case where an appellate court observed in a footnote that the failure to comply with a technical statute simply caused no harm.

*Malick* involved disqualifications of signatures based on the theory that signers had not also properly *printed* their name because they wrote in cursive. The signers did not "separately" print "each letter of his or her full name" in signing the referendum petition. (See *Malick v. Athenour, supra*, 37 Cal.App.4th at p. 1127.) The court refused to interpret section 105 (which tracks § 100) as requiring the separate printing of each letter because such an interpretation did not go to the purpose of the printed-name requirement of assisting the clerk in ascertaining the validity of the signature. Such an interpretation also ran "afoul" of the policy of resolving doubts in favor of referendums. (*Malick, supra*, 37 Cal.App.4th at p. 1126.)

*Malick* is an extreme example of a no harm case. The fact that some letters in the printed name box put there by some signers might have been touching each other (transforming a "printed" name into a "written" name) of course makes no difference when the name is otherwise legible. The opposite result would mean that the signatures supporting every candidate and ballot proposition would be scrutinized by opponents hoping for a technical disqualification based on, literally, a slip of the pen. De minimis non curat lex.

## IV. DISPOSITION

The judgment denying the writ of mandate is affirmed. In the interests of justice each side shall bear its own costs on appeal.

Rylaarsdam, J., and Moore, J., concurred.