Filed 5/29/25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO PUBLIC LIBRARY FOUNDATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> DIANA FUENTES, as City Clerk, etc., et al., <br><br> Defendants and Respondents. | D084135 <br><br><br> (Super. Ct. No. 37-2023-00014954-CW-WM-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Marcella O. McLaughlin, Judge.  Reversed and remanded.

Rutan & Tucker, James R. Sutton, Peter J. Howell and Erik C. Leggio, for Plaintiffs and Appellants.

Mara W. Elliott, City Attorney, M. Travis Phelps, Assistant City Attorney, and Benjamin P. Syz, Deputy City Attorney, for Defendant and Respondent Diana Fuentes, in her capacity as San Diego Interim City Clerk.

Office of the County Counsel, County of San Diego, Katie A. Richardson, Joshua M. Heinlein and Michael P. Masterson, for Defendant and Respondent Cynthia Paes, in her official capacity as San Diego County Registrar of Voters.

# I.    INTRODUCTION

The California Constitution's 1911 amendment, which established the initiative and referendum, reflects the belief that the people hold the ultimate authority in government.  (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 (*Associated Home Builders*).)  These mechanisms are not government-bestowed privileges but powers the people have deliberately retained.  (*Ibid.*)  Courts have consistently underscored the importance of protecting this right, recognizing it as a vital element of democracy.  (*Ibid.*)  Judicial precedent favors interpreting this power broadly to prevent undue limitations, and when legal uncertainties arise, courts resolve them in favor of maintaining the people's direct legislative influence.  (*Ibid.*)

Here, we evaluate the procedures employed by election officials to validate signatures on an initiative petition to determine whether the initiative qualifies for placement on the ballot.[1]  Election officials invalidated certain signatures on an initiative petition for reasons such as incorrect dates, address misspellings, illegibility, and nonstandard abbreviations.  We conclude election officials reasonably excluded signatures dated outside the stated circulation period described under penalty of perjury in the circulator's affidavit, or circulator date ranges which did not include the dates written by the voters next to their signatures.

Election officials, however, acted arbitrarily in rejecting signatures due to some misspellings, illegibility, or nonstandard abbreviations.  Such irregularities will not automatically disqualify a signature if the signer's

---

[1]    Although this controversy is technically moot, we exercise our discretion to address the merits because it addresses issues of broad public interest and errors of law that are likely to recur.

2

voter registration record can be located and their identity as a registered voter is verifiable by comparing the information in the petition with the information in the voter registration record.

We also address an ambiguity in San Diego Municipal Code section 27.1020, subdivision (c) regarding which general election to use in determining the number of signatures required for an initiative petition to qualify for the ballot. As we will explain, election officials correctly based the number of signatures required on the general election preceding the filing of appellants' notice of intent to circulate an initiative petition.

Accordingly, the judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

In July 2022, the San Diego Public Library Foundation and the San Diego Parks Foundation (appellants) began circulating a petition in support of their proposed "Libraries and Parks Improvement Act" initiative (the Initiative) to provide funding to libraries and parks in the City of San Diego (the City). Appellants sought to have the Initiative placed on the November 2024 ballot. Appellants submitted more than 111,000 signatures to San Diego City Clerk Diana Fuentes (the City Clerk) for verification. Pursuant to an agreement with the San Diego County Registrar of Voters, Cynthia Paes (Registrar; together with the City Clerk, respondents), the City Clerk forwarded the petition to the Registrar to verify the signatures by random sampling procedures established by the Elections Code.

The Registrar reviewed the petition signatures against voter registration records, using a random sample of three percent of the total signatures to verify whether they belonged to registered voters. (San Diego Mun. Code, § 27.1031.) The signature verification process is carried out by

3

trained workers who use a "[n]otes sheet" containing codes to flag different types of issues. The Registrar aims to administer the initiative process fairly by applying "bright line rules" and minimizing subjective judgment in signature reviews. Before a signature is invalidated, it goes through up to four layers of examination. If at any point in this process, the next level of analysis determines a signature is valid, the signature is accepted.

The Registrar determined that out of the 3,336 randomly selected signatures, 2,201 belonged to registered City voters. Based on this sample, the total number of valid signers was estimated at 72,285—fewer than required to qualify the Initiative for the ballot or to trigger a full count under Elections Code[2] section 9115, subdivision (b). The City Clerk informed appellants that, because the number of valid signatures did not meet the qualification criteria, the Initiative did not qualify for submission to the voters. After reviewing the rejected signatures under Government Code section 7924.110, appellants concluded that the Registrar improperly disqualified numerous signers for legally unsupported reasons, violating the First Amendment rights of both the signers and the Initiative's proponents.

Appellants filed a verified petition for writ of mandate and complaint for injunctive and declaratory relief seeking a finding that the Initiative was signed by enough validly registered City voters to proceed to a full count of all signers as contemplated by the Elections Code and the San Diego Municipal Code. Appellants also claimed the City used the wrong election date of November 2020 when calculating the number of signers needed to qualify the Initiative for the City ballot.

---

[2]    Undesignated statutory references are to the Elections Code.

4

While the trial court found appellants' interpretation of the ordinance on signature calculations to be "reasonable," it also concluded that the ordinance allowed for more than one reasonable interpretation. Giving "great weight" to the City's contrary view, the court concluded the City did not have to use the November 2022 election as the baseline election. The trial court found appellants needed an additional "185 signatures to be deemed valid in order to trigger a full count." The court discussed some of the categories of signers which the Registrar had rejected, before concluding it was not required to address appellants' remaining contentions because appellants could not achieve the 185 signers which they needed.

On appeal, appellants claim respondents infringed on voters' First Amendment right to participate in the initiative process by unreasonably invalidating hundreds of signers based on minor discrepancies or obvious errors. They request that the matter be remanded and respondents ordered to conduct a full count of all the signatures in a manner consistent with the law. Specifically, they challenged respondents' decisions regarding 267 signers, in five separate categories: (1) street name misspelling or handwriting (98 signers); (2) street name improper abbreviation (10 signers); (3) admitted registrar errors (5 signers); (4) obvious errors in voter dating (13 signers); and (5) circulator dating errors (141 signers).[3] They also sought to confirm that the proper baseline election for calculating the required numbers of signers is November 2022, not November 2020, and that the required number of signers to qualify the Initiative for the ballot is therefore 80,020, not 82,566.

---

[3] Appellants do not challenge the Registrar's decisions about whether a signature on the initiative petition matches the signature on that person's voter registration card.

## III.  DISCUSSION

### A. *GENERAL LEGAL PRINCIPLES*

A writ of mandate under Code of Civil Procedure section 1085 is used to compel the performance of a legally mandated duty arising "from an office, trust, or station." (*Morris v. Harper* (2001) 94 Cal.App.4th 52, 58.)  This type of mandate applies when there is a definite, existing duty—typically ministerial—and the "petitioner has a clear, present and beneficial right to performance of that duty." (*Ibid.*)  In reviewing the trial court's decision on a writ of mandate under Code of Civil Procedure section 1085, we generally assess whether its findings and judgment are supported by substantial evidence.  (*Ibid.*)  Nevertheless, when the case involves legal issues rather than factual disputes, we make our own determination about the law.  (*Ibid.*)

"Judicial review is limited to determining whether the local agency's action ' "was arbitrary, capricious or entirely lacking in evidentiary support, or whether it failed to conform to procedures required by law." ' "  (*Walker v. City of San Clemente* (2015) 239 Cal.App.4th 1350, 1362.)  An agency's decision will be upheld if it properly considered all pertinent factors and establishes a reasonable connection between those factors, its decision, and the intent of the enabling statute.  This presents a legal issue.  On appeal, we independently review the agency's determination, applying the same standard of review as the trial court.  (*Ibid.*)

"The legislative power of this State is vested in the California Legislature . . . but the people reserve to themselves the powers of initiative and referendum."  (Cal. Const., art. IV, § 1.)  The initiative power gives voters the power to enact new state laws.  If the measure is approved by popular vote, it becomes law.  (Cal. Const., art. II, § 8; *id.,* § 10, subd. (a).)  The initiative power is liberally construed and any doubts are to be

6

" 'reasonably . . . resolved in favor of ' " that power. (*Associated Home Builders, supra*, 18 Cal.3d at p. 591.)

As a charter city, San Diego has the authority to regulate city elections and the procedures that apply to initiative petitions.[4] (Cal. Const., art. XI, §§ 2, 3, 5, subd (a).) Under this authority, the City adopted an election code ordinance establishing procedures which apply to initiative petitions. (San Diego Mun. Code, Chpt. 2, Art. 7, Div. 10.) "To determine the sufficiency or insufficiency of an initiative petition, the Clerk shall only count valid signatures." (*Id.*, § 27.1022, subd. (c), italics omitted.)

## B. *MOOTNESS*

Appellate courts are limited to deciding ongoing legal controversies, and an appeal can become moot if circumstances change after it is filed. (*Daily Journal Corp. v. County of Los Angeles* (2009) 172 Cal.App.4th 1550, 1557.) We do not render opinions on issues that no longer affect the outcome of the case or on abstract legal principles without practical implications. (*Ibid.*) A case is considered moot if the court is unable to offer the plaintiff any practical or effective remedy. (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1574.) When a case no longer matters due to outside events, courts typically dismiss it. (*Ibid.*) Despite the mootness doctrine, there are three discretionary exceptions where courts can still decide a case: (1) if it involves a significant public issue that is likely to happen again, (2) if the same dispute could arise again between the same parties, and (3) if there is an important unresolved question for the court to

---

[4]    "[C]harter cities [have] the power and authority to legislate in four 'core' areas 'that are by definition, "municipal affairs." ' [citation.]" (*Cobb v. O'Connell* (2005) 134 Cal.App.4th 91, 96.) Elections are one such core area. (*Id.* at p. 97.)

address.  (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479.)

Additionally, a "court may excuse mootness and reach the merits of an issue that is 'capable of repetition yet evading review.' [Citation.]  Case law recognizes the need to address such issues, particularly in 'matters of broad public interest that are likely to recur.' " (*Bracher v. Superior Court* (2012) 205 Cal.App.4th 1445, 1455.)  "This exception is often applied in election cases." (*Kunde v. Seiler* (2011) 197 Cal.App.4th 518, 527.)  " 'Under certain conditions, disputes concerning election procedures are properly reviewable by an appellate court even though the particular election in question has already taken place.' [Citation.]  Even though the relief requested is no longer available, review may be appropriate if the contentions raised are of general public interest 'and are likely to occur in future elections in a manner evasive of timely appellate review.' " (*Huening v. Eu* (1991) 231 Cal.App.3d 766, 770.)

Respondents highlight that appellants' sole request in the trial court was review of the signatures in compliance with the law to assess the Initiative's eligibility for the November 2024 ballot.  Respondents contend this appeal must be dismissed as moot because the deadline for the Initiative to qualify for the November 2024 ballot passed in August 2024, the election has taken place and appellants never sought to expedite the appeal.  Accordingly, they claim we cannot not grant appellants effective relief.  Respondents also argue the public interest exception to the mootness doctrine does not apply because the election has passed and the issue whether the Registrar properly verified the signatures is highly factual and not likely to recur.

8

Appellants argue we can grant the requested relief since the Initiative may be placed on a future ballot. Even assuming the matter is moot, appellants argue this case addresses an issue of broad public interest and errors of law that are likely to recur.

Although appellants planned to have the Initiative on the November 2024 ballot, they are not seeking an order requiring respondents to place the Initiative on the ballot since the election is over. Rather, they seek an order requiring respondents to re-count signatures in a matter consistent with the law. Case authority suggests the matter is not moot because the Initiative could be placed on the next ballot should we determine respondents invalidated signatures in error. (*Loeber v. Lakeside Joint School Dist.* (2024) 103 Cal.App.5th 552, 575 [initiative could be placed on a future ballot despite passing of election deadlines]; *We Care-Santa Paula v. Herrera* (2006) 139 Cal.App.4th 387, 391 [effective relief exists where initiative may be placed on some future ballot].)

The San Diego Municipal Code, however, contains contrary authority. San Diego Municipal Code section 27.0114, addressing the invalidity of petitions, provides: "No petition is valid for use in connection with any election held after the election for which the petition was circulated." (Italics omitted.) Here, the petition was circulated for the November 2024 election. Additionally, San Diego Municipal Code section 27.0101 provides in relevant part: "If there is any ambiguity or contradiction between the provisions of general law and the provisions of this article, the provisions of this article shall govern." Under the maxim that "[p]articular expressions qualify those which are general," these San Diego Municipal Code sections take precedence. (Civ. Code, § 3534; Code. Civ. Proc., § 1859 [when a general provision is inconsistent with a particular provision, the particular provision

9

controls].) Therefore, the municipal code renders the matter moot because it does not allow the Initiative to appear on a future ballot.

The next issue is whether an exception to the mootness doctrine should apply, a decision within our discretion. Notably, the matter is likely to recur, as appellants may submit a new petition in the future. (§ 9115, subd. (e) ["If the petition is found insufficient, no action shall be taken on the petition. However, the failure to secure sufficient signatures does not preclude the filing later of an entirely new petition to the same effect."].) Moreover, this case presents an issue of public interest on matters requiring uniform application of the law throughout the state. It is also an issue that is likely to recur but by its nature will evade review.

Respondents argue the public interest exception to the mootness doctrine does not apply because the issues are highly factual and not likely to reoccur. The City, however, is limited to the ministerial function of ascertaining whether the procedural requirements for submitting a petition are met. (*Farley v. Healey* (1967) 67 Cal.2d 325, 327.) Thus, resolution of this matter turns on the ministerial function of whether respondents properly rejected the Initiative petition due to signatures not complying with legal requirements. Where, as here, the issue involves statutory interpretation and the facts are undisputed, "we exercise our independent judgment and review the matter de novo." (*Alliance for a Better Downtown Millbrae v. Wade* (2003) 108 Cal.App.4th 123, 129.) Accordingly, we exercise our discretion to consider the merits.

C. <em>GENERAL ELECTION DATE USED</em>

1. Additional Background

San Diego Municipal Code section 27.1020, subdivision (c) provides:

> "(c) When submitting the initiative petition, the proponent
> of the initiative, or any individual authorized in writing by

10

the proponent, shall specify whether the Clerk is being requested to verify the validity of signatures of three percent, or of ten percent, of the registered voters of the City as of the last general City election. The Clerk shall issue a certification based upon the percentage requested, as follows:

"(1) Three percent of the registered voters of the City at the last general City election, which would be sufficient to present an initiative petition for the initiation of an ordinance to the Council for the Council's discretionary consideration; or

"(2) Ten percent of the registered voters of the City at the last general City election, which would be sufficient to qualify the initiative petition to be directly submitted to a vote of the people." (Italics omitted.)

On June 27, 2022, appellants filed their notice of intent to circulate materials with the City Clerk's office, and thereafter began circulating their proposed Initiative. The most recent election before filing the notice of intent was the November 2020 general City election. At that election there were a total of 825,660 registered voters.[5] The City Clerk informed appellants they had until December 15, 2022, to collect at least 82,566 valid signatures to qualify the Initiative for the November 5, 2024, ballot. This number equaled 10 percent of the total registered City voters as of November 3, 2020. (San Diego Mun. Code, § 27.1020, subd. (c).) Appellants did not challenge the number of required valid signatures and confirmed the numbers in

_____

[5]    Subdivision (a) of section 324 defines the term " '[g]eneral election' " as either: "(1) The election held throughout the state on the first Tuesday after the first Monday of November in each even-numbered year. [¶] (2) Any statewide election held on a regular election date as specified in Section 1000."

11

correspondence with the City Clerk's office. Another general City election occurred on November 8, 2022.

On December 15, 2022, appellants submitted 111,189 signatures to the City Clerk. In early January 2023, appellants sent a letter to the City Clerk seeking clarification regarding the number of required signatures, claiming the "last general City election" would be the November 2022 election.[6] The City Clerk responded, explaining that after consulting with the San Diego City Attorney she could not revise her decision on which election to use.

The Registrar determined that only 2,201 of the 3,336 randomly sampled signatures were valid, while 1,135 were invalid. Based on this projection, the Initiative petition was estimated to have 72,285 valid signatures, falling short of the required number to qualify for the ballot. Since the Initiative did not meet the threshold of 78,438 valid signatures, it also did not qualify for a full count of signatures to determine if it in fact contained the required number of valid signatures.

2. Analysis

At issue is the proper interpretation of San Diego Municipal Code section 27.1020, subdivision (c). In considering this issue, we apply the ordinary rules applicable to the interpretation of statutes. (*Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 502 ["the rules of statutory construction applicable to statutes are also applicable to local ordinances"].) We first consider the words of the enactment, and if those words, plainly read, are unambiguous, we go no further. (*People ex rel. Feuer v. FXS Management, Inc.* (2016)

---

[6]     For the November 8, 2022, election the number of registered voters in the City *decreased* by roughly 5,000 voters to 800,192. Use of this date would have decreased the number of valid signatures appellants needed to present by 2,500 people, or to 80,020.

12

2 Cal.App.5th 1154, 1159.) If the enactment is susceptible to more than one interpretation, we may consider various extrinsic aids, such as its history, public policy concerns, and the scheme of which the enactment is a part. (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.) Nonetheless, even if an enactment is unambiguous on its face, it must be interpreted to avoid an absurd result that does not advance its purpose. (*California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333, 340.)

Additionally, respondents' interpretation of its municipal code "is entitled to deference" in our independent review of the meaning or application of the law. (*MHC Operating Limited Partnership v. City of San Jose* (2003) 106 Cal.App.4th 204, 219.) The degree of deference accorded an agency's interpretation is " ' "not susceptible of precise formulation, but lies somewhere along a continuum," ' " or, in other words, is "*situational.*" (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 & 12 (*Yamaha*).) Greater deference should be given to an agency's interpretation where " 'the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion.' " (*Id.* at p. 12.)

Courts are " 'more likely to defer to an agency's interpretation of its own regulation than to its interpretation of a statute, since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.' " (*Yamaha, supra*, 19 Cal.4th at p. 12.) Other factors supporting an agency's interpretation include careful consideration by senior officials, a consistent and long-standing interpretation, and an interpretation that aligns with the regulation's enactment. (*Id.* at p. 13.)

Appellants argue the unambiguous language of San Diego Municipal Code section 27.1020, subdivision (c) provides that the number of signatures needed to qualify a City initiative for the ballot is based on the number of registered voters in the City at the election occurring most recently before the date a proponent submits the final signed petition to the City Clerk. They contend the phrase "when submitting the initiative petition" in San Diego Municipal Code section 27.1020, subdivision (c) cannot be read as referring to the actions taken when proponents begin the initiative process. Instead, it can only be read to refer to the end of the signature gathering process.

They argue that this division of the San Diego Municipal Code follows a chronological sequence, beginning with the required notices to initiate the process, followed by guidelines on petition formatting and circulation, and concluding with later sections—including San Diego Municipal Code section 27.1020—that govern the process's final stages. Accordingly, they claim the City Clerk erred as a matter of law by using the voter registration numbers from the November 2020 general election (when they started the initiative process), not the numbers from the November 2022 general election (when they submitted the signed petition), to calculate the number of signatures required to qualify the Initiative for the ballot.

Respondents disagree with appellants' reading of San Diego Municipal Code section 27.1020, subdivision (c). As the title to this section indicates ("Submitting Initiative Petition to Clerk"), they contend this section is intended to establish certain requirements that the *proponent* must follow when submitting an initiative petition to the City Clerk. This section requires the proponent to notify the City Clerk of the percentage of registered voter signatures to be verified, ensuring the City Clerk can certify their validity if the required number is met. This section does not establish the

14

election to use to determine the necessary number of registered voters or that the "last general City election" shall be the one prior to a proponent's submission of an initiative petition.

Respondents reasonably argue the purpose of this section is for the proponent of an initiative petition to alert the City Clerk whether three or 10 percent of the signatures require verification so that the City Clerk knows the number of signatures it is being asked to verify after receipt of the petition. Stated differently, this section establishes certain requirements a proponent must follow when submitting an initiative petition to the City Clerk, not to dictate to the City Clerk which election to use to determine the necessary number of registered voters. Because the interpretations tendered by both parties are reasonable, we conclude San Diego Municipal Code section 27.1020, subdivision (c) is ambiguous and turn to other factors to discern its intended meaning.

The San Diego City Charter provides that an initiative directly submitted to the voters "shall require a petition signed by ten percent of the registered voters of the City *at the last general City election.*" (San Diego City Charter, art. III, § 23, italics added.) The current City Clerk submitted a declaration stating her office follows a long-standing policy of using the general election *preceding* the filing of a notice of intent to circulate an initiative petition to determine the required number of valid signatures for ballot qualification.

According to the City Clerk, her office has consistently enforced this policy for all initiative petitions, regardless of whether voter registration numbers rise or fall between general elections. Additionally, this policy applies not only to initiative petitions but also to municipal referendums and recall petitions, which require proponents to collect and submit valid

15

signatures from a specific percentage of registered voters in the City. By maintaining this approach, the policy provides clarity and consistency for the City Clerk, the Registrar, petition proponents, and the public regarding the required number of valid signatures before the signature collection process begins.

In March 2019, the City Clerk proposed amending the San Diego Municipal Code to add subdivision (c) to section 27.1020 regulating initiative petitions. In a staff report to the City Council, the City Clerk proposed this amendment because "the Clerk must be made aware of what threshold the proponent(s) is [*sic*] seeking to meet." The report says nothing about changing the City Clerk's existing policy of using the general election preceding the filing of a notice of intent to determine the required number of valid signatures for ballot qualification. Moreover, the fact respondents have " 'consistently maintained the interpretation in question' " before and after adding subdivision (c) to section 27.1020, suggests respondents' interpretation is likely to be correct. (*Yamaha, supra*, 19 Cal.4th at p. 13.)

Using the last general City election prior to filing the notice of intent to circulate an initiative petition is supported by public policy considerations. This approach creates certainty before a proponent begins collecting signatures. As the court in *Coalition for Fair Rent v. Abdelnour* (1980) 107 Cal.App.3d 97 (*Coalition for Fair Rent*) explained, "proponents of an initiative measure [need] to know how many signatures are required before they begin to collect them" because such knowledge "helps them to determine the feasibility of circulating the petition and also to decide how many extra signatures should be obtained to protect against the possibility of

16

disqualification." (*Id*. at p. 112.)[7]  Subdivision (a) of section 9210 provides additional support for respondents' interpretation because it requires cities to "[a]scertain the number of registered voters of the city . . . effective at the time the [notice of intent] is published."

In summary, we conclude respondents correctly based the number of signatures required on the general election preceding the filing of appellants' a notice of intent to circulate an initiative petition.

### D. *DISQUALIFICATION DUE TO DATE ERRORS, MISSPELLING, HANDWRITING, AND NON-STANDARD ADDRESS ABBREVIATIONS*

1. Legal Principles

"Notwithstanding any other provision of law," initiative petitions may be signed only by persons who are "eligible registered voter[s]" at the time of signing.  (§ 100, subd. (a).)  When signing, voters must "personally affix" their signature, printed name, and place of residence (including street name and number) to the petition.  (*Id.,* subd. (b), § 9020 [reiterating same requirements].)[8]  The elections official must verify that the address on the petition matches the address on the voter's registration affidavit.  If the addresses are not the same, the signature will be invalid.  (§ 105,

---

[7]  *Coalition for Fair Rent, supra*, 107 Cal.App.3d 97 addressed the amendment of a city charter by initiative.  (*Id.* at p. 101.)  Appellants' attempt to distinguish this case on this ground is a distinction without a difference because the same public policy considerations exist.

[8]  Disabled voters who cannot write the required information on a petition or paper can ask someone else to write their name and address in the correct spaces.  However, the voter must personally sign or make a mark, and a witness must sign to confirm it.  (§ 100.5.)

17

subd. (a)(1).) The elections official must still count a signature even if the signer's apartment or unit number is incomplete or inaccurate. (*Id., subd.* (a)(2).) The San Diego Municipal Code similarly requires that voters sign initiative petitions in their own handwriting and provide their printed name and residence address, including the street and house number or another clear location identifier. (*Id.*, § 27.1011, subd. (a).) Unlike state law, voters must also date their signature. (*Ibid.*)

Every petition submitted to elections officials must be accompanied by a declaration under penalty of perjury, signed and dated by the circulator of the petition.[9] (§ 104, subds. (a), (c).) The declaration must state that the declarant circulated the petition, witnessed each of the signatures "being written," and believes each signature to be the genuine signature of the person whose name it purports to be. (*Id.*, subd. (b).) The petition must also include, "in the circulator's own hand," the circulator's printed name and address and the dates between which the signatures to the petition were obtained. (*Id.*, subd. (a).) The San Diego Municipal Code similarly requires circulators to attach to every initiative petition an affidavit of authenticity of circulator, signed and dated by the circulator, with the circulator's printed name, the place of signing and the beginning and final date of circulation. (San Diego Mun. Code, § 27.1013.) "The City Clerk shall not accept an initiative petition that is not in substantial compliance with this division." (*Id.*, § 27.1021, subd. (a), italics omitted.)

---

[9]    Appellants hired a petition circulation company to obtain signatures at retail establishments and events, where voters signed the petition on a clipboard or at a table.

2. Additional Background Regarding Date Errors

The Registrar disqualified 154 signers due to errors relating to voter signature dates or dates written by the petition circulator. It disqualified 13 signers because the signer wrote a date on the petition which was outside the stated circulation period (signer dating errors). The 13 rejected signers are in the chart below, with appellants' comments in parenthesis.

| Voter Signature Date | Circulator Affidavit Dates of Circulation |
|---|---|
| 6/10 | 9/10 |
| 4/9/1998 (presumably voter's birthday) | 12/9 |
| 9/6 | 8/5 – 8/7 |
| 9/25 | 8/25 – 8/26 |
| 1/31/1992 (presumably voter's birthday) | 8/18 – 8/21 |
| 7/21 (or maybe 7/28) | 7/28 – 7/31 |
| 9/8/22 or 8/8/22 | 8/15–8/18 |
| 1/27 | 11/27 – 12/3 |
| 12/8 (hard to read) | 12/7 – 12/8 |
| 2/28 (could be 9/28) | 9/28 – 10/4 |
| 2/18/22 or 2/16/22 | 9/15 - 9/17 |
| 4/17 | 7/10 – 7/22 |
| 12/4 OR 12/14 | 12/13 – 12/14 |

The Registrar disqualified another 141 signers because the circulators wrote date ranges on the circulator affidavits at the bottom of the petition which did not include the dates written by the voters next to their signatures (circulator dating errors). All the signatures were signed within the legally permissible circulation period.

3. Date Errors Analysis

Appellants note the disqualified signers were all qualified City voters on the erroneous date they entered and none signed outside the 180-day circulation period. Instead, the Registrar rejected the 13 voters because

19

either the dates provided by the voters were a few days before or after the dates of circulation listed in the circulator affidavit, or because the voter made an obvious error, such as listing his or her birthday rather than the signing date in the date field on the petition. Appellants contend that neither reason relates to the legitimate goal of confirming signers' voter registration status, and disqualifying voters over minor dating errors unfairly prevents bona fide City voters from exercising their First Amendment rights.

Appellants argue that the San Diego Municipal Code and San Diego City Clerk's Administrative Guidelines identify only one reason for invalidating a petition entry due to a circulator affidavit issue: the circulator's failure to sign. (San Diego Mun. Code, § 27.1022, subd. (d).) A mismatch between the voter date and the circulator's date is not grounds for disqualification. Had the City Council wished to mandate disqualification for such mismatches, it could have enacted a law to that effect.

Respondents argued the 154 invalidated signer and circulator dating errors categories involve a voter signature date outside the circulation period attested to under the penalty of perjury in the circulator's affidavit.[10] In each of these petitions, the circulator signed the affidavit of authenticity verifying under penalty of perjury that the signatures "were made in [the circulator's] presence and were observed by [the circulator]" as required by

---

[10] In their appellate briefing respondents note the trial court did not address this category of challenged signatures and argue we should not address it for the first time on appeal. They also contend this category will make no difference to the resolution of this appeal because appellants would still fall short of the 185 signatures needed for a now-moot full count. Because we are addressing this appeal to provide future guidance and not addressing whether appellants have enough valid signatures, we summarized the arguments respondents made in the trial court on this issue.

San Diego Municipal Code section 27.1013. If the date of the signature does not fall within the circulation period attested to by the circulator, the circulator cannot truthfully attest that the initiative petition was signed in the circulator's presence or observed by them and cannot verify the authenticity of any signatures dated outside the circulation period. As a result, these signatures cannot be valid under the San Diego Municipal Code.

The rejection of signatures that do not comply with San Diego Municipal Code requirements cannot be characterized as a clerical error. The signature dating requirement furthers the public policy goals of ensuring that the signer is a registered voter at the time of signing. By requiring a voter to date their signature, an examination of the voter rolls can easily confirm whether the voter was a registered voter *at the time* the petition was signed. Disregarding this requirement would be contrary to the express intent of the City's legislative body, and amounts to amending the municipal code, which is beyond the judicial competence.

We agree with respondents that the signature dating requirement furthers the public policy goals of ensuring that the signer is a registered voter at the time of signing. While the Registrar can review its voter registration database to confirm that on the erroneous date listed in the petition the signer was a registered voter, this does not change the fact the 154 invalidated signatures involved either a voter signature date outside the stated circulation period attested to under the penalty of perjury in the circulator's affidavit, or circulator date ranges which did not include the dates written by the voters next to their signatures. Accordingly, we cannot conclude respondents acted arbitrarily by invalidating signatures that were

21

not in substantial compliance with San Diego Municipal Code requirements.[11]

4. Additional Background Regarding Misspelling, Handwriting and Nonstandard Address Abbreviations

The Registrar rejected 98 signatures because the signer misspelled his or her address, each individual letter of a street address was not legible, or letters in the street address were deleted or transposed. For example, the Registrar's office invalidated a signer who wrote: "Creeekwood" rather than "Creekwood"; "Wunder line Ave." rather than "Wunderlin Ave."; and "Kellog St." rather than "Kellogg St." In each case, the street number, city, and zip code matched the information on the signer's voter registration form. Thus, the Registrar was able to locate the voter registration information associated with each petition entry.

The Registrar also rejected 10 signers because the voters abbreviated their street name or used an abbreviation for an address or address suffix which does not appear on the United States Postal Service's (USPS) list of standard abbreviations (improper street abbreviation). The rejected abbreviations are set forth in the charts below:

| Address Listed on Petition | Address as Registered | USPS Standard Suffix Abbreviation | Other USPS Commonly Used Abbreviations |
|---|---|---|---|
| Black Mt. | Black Mountain | Mtn | Mtain, Mtntn, Mountin, Mtin |
| PCH | Pacific Coast Highway | Hwy | Highwy, Hiway, Hiwy, Hway |
| Clmt Mesa | Clairemont Mesa | N/A | N/A |

---

[11]    Improper dating issues are a circulator training issue.

| | | | |
|---|---|---|---|
| Clairemt Mesa | Clairemont Mesa | N/A | N/A |
| Ct Playa Las Brisas | Corte Playa Las Brisas | Ct (for "Court") | N/A |
| C.P. Acapulco | Camino Playa Acapulco | N/A | N/A |

| Address Listed on Petition | Address as Registered | USPS Standard Suffix Abbreviation | Other USPS Commonly Used Abbreviations |
|---|---|---|---|
| Calle Mar de Arm | Calle Mar de Armonia | N/A | N/A |
| Spectrum Cntr Blvd | Spectrum Center Boulevard | Ctr | Cen, Cent, Centr, Centre, Cntr, Cnter, Ctr |
| S. Set Cliffs Blvd | Sunset Cliffs Boulevard | N/A | N/A |
| Caminto E | Camino Espino | N/A | N/A |

5. Analysis Regarding Misspelling, Handwriting and Non-standard Address Abbreviations

Appellants assert the 98 rejected signatures because of misspelling or illegible writing is hyper-technical and should be overturned. They argue the trial court likewise erred in analyzing the Registrar's rejection of these signers as involving "factual" determinations and deferring to the Registrar's decision. They assert the policy of disqualifying signers who use irregular abbreviations for their addresses is also not supported by any law or regulation. The Registrar's job is to ascertain whether the person who signed the petition is registered to vote in the given jurisdiction.

Respondents contend section 105 provides that the residence address written on the petition must be "the same" as the address in the signer's

voter registration record for it to count as a valid signature. Therefore, any difference in street name spelling invalidates the signature.

Section 105 provides the residence address written on the petition must be "the same" as the address in the signer's voter registration record. Respondents' strict approach, however, fails to account for natural variations in a person's handwriting due to age, illness, or the hurried circumstances under which petitions are often signed—such as in front of a store or on a street corner—compared to writing done in a more controlled setting. This approach would also disenfranchise less educated voters who might spell a street address phonetically. Further, this overly technical approach could exclude legally registered voters with certain disabilities such as dyslexia, or individuals with poor handwriting.

Moreover, the purpose of comparing information written on a petition with that contained in voter registration records is to determine whether signers were registered voters on the date they signed the petition. (See §§ 100, subd. (b), 105, subd. (a)(1) & 9020, subd. (a); San Diego Mun. Code, § 27.1011(a); Cal. Code of Regs., tit. 2, § 20931(a)(2).) The central issue is whether this purpose can be accomplished without letter-for-letter and word-for-word matches between information written on a petition with that contained in voter registration records.

While there is limited case law on this issue, existing precedents do not support the strict interpretation urged by respondents. In *Wheelright v. County of Marin* (1970) 2 Cal.3d 448, 456 (*Wheelright*), the California Supreme Court considered whether the trial court erred in accepting a county clerk's determination regarding the invalidity of 94 signatures on a referendum petition. (*Id.* at pp. 451, 456.) The trial court had found the clerk's original reasons for disqualification improper. (*Id.* at p. 453.) At a

24

hearing the clerk testified he would have rejected the signatures anyway, based on his belief that the handwriting on the petition did not match the voter's registration affidavit. (*Ibid.*) After examining the signatures, the court found sufficient similarities to suggest they were signed by the same person. (*Ibid.*) It noted that if it had the authority to overrule the clerk, it would err on the side of validating the signatures. (*Ibid.*) However, the court concluded that it could only override the clerk's decision if the similarities were undeniable or the rejection was clearly arbitrary. (*Ibid.*)

The trial court noted that this was a judgment roll appeal, meaning it had to assume the evidence supported the finding that the 94 signatures lacked sufficient similarity, and the differences were significant enough that the clerk's rejection was neither unreasonable nor arbitrary. (*Wheelright, supra*, 2 Cal.3d at p. 454.) The Supreme Court found no error, explaining that a clerk must reject obviously fraudulent signatures that do not match a voter's registration affidavit. (*Id.* at p. 456.) However, if the differences are so minor that rejecting the signature would be unreasonable or arbitrary, the court cannot uphold the clerk's decision. (*Ibid.*) When the dissimilarities "and other indicia" are significant enough that the validity of the signature is uncertain, and the clerk's determination was neither unreasonable nor arbitrary, the court must accept the clerk's judgment. (*Ibid.*)

Stated differently, *Wheelwright, supra*, 2 Cal.3d 448, establishes that where the signature dissimilarities are so minor as to make the clerk's rejection of the signatures an unreasonable or arbitrary act, a court may reject the clerk's determination. (*Id.* at p. 456.) The *Wheelwright* court acknowledged that while the clerk's duties are ministerial, they are not purely mechanical. (*Id.* at p. 455.) The clerk must visually compare each handwritten signature with the voter's registration affidavit and assess

25

whether the similarities are enough to certify the signature as valid. (*Id.* at pp. 455–456.)

Also instructive is *Malick v. Athenour* (1995) 37 Cal.App.4th 1120 (*Malick*). There the Court of Appeal considered whether an elections official had improperly disqualified petition signers who either illegibly printed their names or wrote them in cursive in the space designated for a printed name. (*Id.* at p. 1124.) The court ruled that the validity of these disqualifications was a legal issue for the courts to decide and the trial court was not bound by the "election department's interpretation of the law or the election department's adoption of a policy contrary to law." (*Id.* at p. 1128.) Rejecting the claim that failing to print a name automatically invalidated a signature, the court explained that the purpose of requiring printed names was to assist in verifying voter registration. (*Id.* at p. 1126.) It concluded that insisting on perfectly separated printed letters did not further that goal and conflicted with the judicial policy of favoring the exercise of referendum rights. (*Ibid.*) The court ultimately ruled that the automatic invalidation of such signatures, without any verification effort, was arbitrary as a matter of law. (*Id.* at p. 1127.)

The parties dispute whether the misspellings, illegible handwriting, and use of nonstandard abbreviations at issue here are more like *Wheelright*, requiring the use of judgment in assessing signature validity, or *Malick* where no such judgment was required. Both opinions inform our decision.

Here, one of appellants' attorneys reviewed the signatures rejected by the Registrar during the random sample review of the initiative petition signatures. She viewed the signatures either on the actual petitions or using a computer to view PDF copies of the signatures. When appropriate, she and Registrar personnel would also inspect the Registrar's electronic database to

26

compare a voter's information as written on the petition to the information written in the Registrar's electronic database. Review of this declaration shows it is undisputed that all the challenged signatures either contained misspelled addresses, illegible handwriting, or nonstandard abbreviations. It is also undisputed that despite these issues, the Registrar was able to locate the signer's voter registration record.

Thus, like *Malick*, the question before us is the impact of these issues and whether the Registrar acted arbitrarily in rejecting these signatures. The Registrar's elections manager submitted a declaration explaining that after the computer system selects the random sample of signatures to verify, the Registrar's office begins the process of signature verification. Trained workers are provided a "[n]otes sheet" with a summary of how to treat different signatures. Workers also have guidelines periodically published by the California Association of Clerks and Election Officials to guide elections officials in the signature verification process.

Because the San Diego Municipal Code requires petition signers to date their signatures, the Registrar first checks to determine whether the signature dates fall within the petition's circulation dates as written by the circulators. If the signature date falls outside the circulation dates, the signature is invalid. If the date written by the signer is within the circulation dates, the Registrar then reviews the signer's residence address. Because section 105 requires the address written on the petition be "the same" as the address on the signer's voter records, if an address is illegible or spelled differently than what appears in the voter records, the signature is invalidated. If a signature contains proper dates, printed name, and residence address, the Registrar then verifies the signature itself. The signature on the petition is compared to the signatures the Registrar has on

file for the voter.  A petition signature is deemed invalid "only if it does not compare to any signature" the Registrar has on file for the voter.

As *Wheelright* instructs, the duty of election officials is ministerial not "mechanical." (*Wheelwright, supra*, 2 Cal.3d at p. 455.)  When determining the validity of a signature, election officials must look at "other indicia" to determine signature validity.  (*Id.* at p. 456.)  Here, the Registrar uses a mechanical approach to signature validation.  If an address is misspelled, illegible, or contains nonstandard abbreviations, the signatures are not even reviewed, but instead are automatically invalidated.

The Registrar's policy of looking at addresses in isolation without even considering the key issue of whether the signature on the petition matches the voter registration form is arbitrary and contrary to law because the Registrar's ministerial duty is to verify the petition signatures by comparing the handwriting of the signatures in the petition with those on file for the voter.  (*Malick, supra*, 37 Cal.App.4th at pp. 1126–1127.)  Where, as here, the Registrar can locate the signer's voter registration record, requiring letter-for-letter and word-for-word matches between information written on a petition with that contained in voter registration records does not further the strong judicial policy of resolving all doubts in favor of the exercise of the power of initiative.  (*Associated Home Builders, supra*, 18 Cal.3d at p. 591.)  Accordingly, here the trial court erred by deferring to respondents' interpretation of the law.

In sum, misspelled addresses, illegible handwriting, or using nonstandard abbreviations does not automatically invalidate a signature where the signer's voter registration record can be located and the identity of the signer as a registered voter can be established by comparing the signature on the petition with the signatures the Registrar has on file for the

voter. Although it is possible that, even after reviewing both the petition and the affidavit of registration, an election official may be unable to validate a signature due to factors such as illegibility, misspellings, or nonstandard abbreviations, that specific question is not before us.

Considering San Diego Municipal Code section 27.0114 bars the Initiative from appearing on a later ballot, it appears there is no relief the trial court can provide appellants on remand. Nonetheless, we decline to order the trial court to dismiss the petition as moot and express no opinion on how the trial court should rule. On remand, the parties may address whether the trial court can grant any effective relief, and if so, what kind.[12]

## IV. DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for further hearing consistent with this opinion. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

RUBIN, J.

I CONCUR:

DO, J.

---

[12] Respondents admitted to mistakenly disqualifying five signatures and appellants argue we should instruct the Registrar to count these admitted errors. The trial court did not address this category, nor did respondents address this category in the trial court or on appeal. Appellants may raise this issue on remand.

29

O'Rourke, J., Concurring and dissenting

I concur with the majority's conclusions concerning the proper general election date and the disqualification of 154 signatures due to date errors. However, I respectfully dissent with the majority's holding concerning the decision to reject signatures due to nonmatching residence addresses.

"[T]he duties and powers of the city clerk in reference to his examination of referendum petitions . . . are purely ministerial." (*Ley v. Dominguez* (1931) 212 Cal. 587, 602.) The law is settled that elections officials may not examine extrinsic evidence or go beyond the petitions and affidavits of registration in comparing information from those documents. (*Assembly of State of Cal. v. Deukmejian* (1982) 30 Cal.3d 638, 648, fn. 8; *Wheelright v. County of Marin* (1970) 2 Cal.3d 448, 456 (*Wheelright*); *Ley v. Dominguez*, at p. 602; *Mapstead v. Anchundo* (1998) 63 Cal.App.4th 246, 267 (*Mapstead*).) "A ministerial office may not add or subtract language to an unambiguous statute." (*Boyer v. County of Ventura* (2019) 33 Cal.App.5th 49, 54.)

In my view, the Registrar's decision to invalidate signatures for nonmatching residence addresses is entirely consistent with sections 100, 105, and 9020 of the Elections Code (undesignated statutory references are to that law), and thus was not arbitrary or capricious. As the majority recognize, sections 100 and 9020 require a petition signer to personally affix his or her "residence address, giving street and number . . . ." (§§ 100, subd. (b), 9020, subd. (a)(3).) "Section 105 directs election officials regarding how to determine whether the 'residence address' requirement has been satisfied: '[T]he election official shall determine that the residence address on the petition . . . *is the same* as the residence address on the affidavit of registration. If the addresses are *different* . . . the affected signature shall not

be counted as valid . . . .' " (*Mapstead, supra*, 63 Cal.App.4th at pp. 262, 265, italics added, quoting § 105.)  Section 9020 specifies a single exception to section 105:  "An incomplete or inaccurate apartment or unit number in the signer's residence address shall not invalidate their signature pursuant to section 105."  These requirements "serve to safeguard the integrity of the electoral process, and to provide elections officials with orderly and clear procedures for determining whether a measure is qualified for the local ballot."  (*Mapstead,* at p. 257.)

Mapstead involved the Registrar's invalidation of signatures due to incomplete residence addresses, including 34 addresses that showed a street name and city, but no home number; a house number and street name, but no city; and only a city, but no house number or street.  (*Mapstead, supra*, 63 Cal.App.4th at pp. 266-267.)  The Court of Appeal held the law did not permit the Registrar to "assume or guess" whether a signer's address remained the same.  (*Id*. at p. 268.)  The court pointed out that section 105 required residence addresses to match, and the Registrar could not assume that a signer who omitted a house number lived at the same address, because they may have moved to a different house on the same street.  (*Id*. at p. 268.)  The court emphasized that the Registrar has only 30 days business days to verify the signatures and may not consider extrinsic evidence.  (*Ibid*.)  It held, "consistent with the statutes, the statutory purposes for the residence address requirement and the time constraints upon elections officials, the Registrar simply should not investigate or speculate about the location of a residence" and thus his action invalidating the 34 signatures was not arbitrary, capricious, or an abuse of discretion.  (*Ibid*.)  "[T]he responsibility for providing a complete residence address . . . rests with the signers, not with the Registrar."  (*Ibid*.)

Here, the majority is reading out section 150's procedures from the scheme. The statute is unambiguous: The word "same" means "identical." (Oxford English Dict. (2018) https://www.oed.com/dictionary/same_adj?tab=meaning_and_use #24447591 [as of May 29, 2025], archived at <https://perma.cc/SY87-YHUX.) While the discrepancies in residence addresses are not of the same character as in *Mapstead*, they implicate the same concerns. I would conclude, for example, that an election official may not assume that an address written on a petition as "Caminto E" is a match of "Camino Espino," even though all other information, including house number, may be identical. This is not a standard abbreviation from which the elections official can simply determine the address without using extrinsic evidence to confirm the match. (See, e.g., Cal. Code Regs., tit. 2, § 20931(a)(2) [petition signature may be included in raw count where "[t]he signer provides the correct house number but abbreviates the street name or uses another name for the street, and the elections official can determine the address"; giving example of a signer writing 132 Hollywood Bl. on the petition when the street is Hollywood Boulevard].) The majority criticizes the Registrar's approach to comparing information on the petition with a signer's registration record as overly strict or technical, and failing to account for how individuals typically sign petitions. (Maj. opn., *ante*, at p. 24.) But the record is devoid of any evidence of how any of these 98 signatures were collected or signed, or the circumstances of the individuals whose signatures were rejected. The majority's reasoning rests on speculation as to these matters.

The majority also rely on *Wheelright, supra*, 2 Cal.3d 448 and *Malick v. Athenour* (1995) 37 Cal.App.4th 1120, but there, the appellate courts dealt with a very different task: the duty of election officials to determine the

3

validity of *signatures* on a referendum petition.  In assessing these duties, the court in *Wheelright* acknowledged "[s]ome judgment on the part of the [election official] is required."  (*Wheelright*, at pp. 455-456.)  "Each signature on the petition must be handwritten and [the election official] must compare this handwriting with that on the registration affidavit to determine if it is the handwriting of the voter.  [The official] must use . . . eyesight and critical faculties to determine whether sufficient similarities exist . . . to certify that this is a valid signature.  . . .  Where there are dissimilarities which are so minor as to make . . . rejection of the signature an unreasonable or arbitrary act, the court may not accept the [official's] determination.  Where . . . the dissimilarities are not so minor and the similarities are not so great that only one conclusion can be made as to the validity or invalidity of the signature, and where the court finds that in acting upon these dissimilarities and other indicia the [official] was not acting unreasonably or arbitrarily . . . , the court must accept the [official's] determination."  (*Id.* at pp. 455-456.)  It was in that context that the *Wheelright* court stated the duties "are ministerial but they are not mechanical" as "[t]hey involved more than a computation of the number of signatures."  (*Id.* at p. 455; accord, *Malick, supra*, 37 Cal.App.4th at pp. 1126-1127 [refusing to interpret section 105 to require signers to separately print each letter of his or her full name]; see also *Capo for Better Representation v. Kelley* (2008) 158 Cal.App.4th 1455, 1466 [discussing *Malick*: "The fact that some letters in the printed name box put there by some signers might have been touching each other (transforming a 'printed' name into a 'written' name) of course makes no difference when the name is otherwise legible"].)

Ascertaining whether residence addresses match is different.  By their decision, the majority is putting a burden on election officials to go beyond

4

their ministerial duty and the law, and either make assumptions or conduct research outside the relevant documents. Accordingly, I dissent from the majority's conclusions in this regard.

O'ROURKE, Acting P. J.